Colin R. Kass, admitted *pro hac vice*
Scott M. Abeles, admitted *pro hac vice*
Sally M. Handmaker, SBN 281186
PROSKAUER ROSE LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2533
T: (202) 416-6800
F: (202) 416-6899
ckass@proskauer.com
sabeles@proskauer.com
shandmaker@proskauer.com

Robert E. Davies, SBN 106810
DONAHUE DAVIES LLP
P.O. Box 277010
Sacramento, CA 95827-7010
T: (916) 817-2900
F: (916) 817-2644
rdavies@donahuedavies.com

*Attorneys for Defendant*
Chrysler Group LLC

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| **MATHEW ENTERPRISE, INC.,**  )<br>)<br>Plaintiff,  )<br>)<br>v.  )<br>)<br>**CHRYSLER GROUP LLC**,  )<br>)<br>Defendant.  )<br>) | Case No. 13-cv-04236 EJD PSG<br><br>**Chrysler's Motion to Dismiss**<br><br>Date:        April 25, 2014<br>Time:        9:00 a.m.<br>Courtroom: 4<br>Location:   280 South 1st Street, 5th Floor<br>                 San Jose, CA 95113<br>Action Filed: September 12, 2013<br>Trial Date:   To Be Determined |

## NOTICE OF MOTION

PLEASE TAKE NOTICE that on April 25, 2014, at 9:00 a.m., or as soon thereafter as possible, in Courtroom 4 of the above-entitled Court, located at 280 South 1st Street San Jose, CA 95113, Defendant Chrysler Group LLC will and does hereby move the Court for an order dismissing the Complaint and this case under Federal Rule of Civil Procedure 12(b)(6).

Plaintiff Mathew Enterprise, Inc. fails to state a cognizable claim for relief because it has not and cannot properly allege that (i) Chrysler engaged in unlawful price discrimination in violation of Sections 2(a), 2(d), or 2(e) of the Robinson-Patman Act, 15 U.S.C. § 13(a), (d), (e), as claimed in Counts I and II; (ii) Chrysler failed to deliver reasonable quantities of ordered vehicles in violation of Cal. Veh. Code 11713.3(a), as alleged in Count III, or (iii) Chrysler breached any implied covenant of good faith and fair dealing arising out of the parties' dealer agreement, as claimed in Count IV.

Accordingly, all claims should be dismissed with prejudice.

DATED: November 12, 2013

Respectfully submitted,

/s/   *Colin R. Kass*

Colin R. Kass, admitted *pro hac vice*
Scott M. Abeles, admitted *pro hac vice*
Sally M. Handmaker, SBN 281186
PROSKAUER ROSE LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2533
T: (202) 416-6800
F: (202) 416-6899

Robert E. Davies, SBN 106810
DONAHUE DAVIES LLP
P.O. Box 277010
Sacramento, CA 95827-7010
T: (916) 817-2900
F: (916) 817-2644

*Attorneys for Defendant*
Chrysler Group LLC

# MEMORANDUM AND POINTS OF AUTHORITIES
## Table of Contents

I.      INTRODUCTION ........................................................................................................... 1

II.     ALLEGED FACTS ........................................................................................................ 4

III.    STANDARD OF REVIEW ........................................................................................... 9

IV.     CHRYSLER DID NOT VIOLATE THE ROBINSON-PATMAN ACT BY
        DECLINING TO ADJUST STEVENS CREEK'S SALES TARGETS. ........................... 9

        A.      Stevens Creek Failed to Allege That Chryslers' Incentive Program Was
                "Functionally Unavailable." ................................................................................... 10

        B.      Stevens Creek Failed to Allege that Chrysler's Incentive Program
                Threatens to Substantially Injure, Destroy, or Prevent Competition. ...................... 13

                1.      Chrysler's Sales Incentive Program Did Not Divert Sales. ......................... 14

                2.      Any Sales Diversion Did Not Substantially Injure Competition. ............... 16

V.      CHRYSLER DID NOT VIOLATE THE ROBINSON-PATMAN ACT BY
        OFFERING SAN LEANDRO FAVORABLE RENT TERMS. ........................................ 19

VI.     STEVENS CREEK FAILED TO STATE A COGNIZABLE "FAILED
        DELIVERY" CLAIM. ................................................................................................ 20

VII.    STEVENS CREEK FAILED TO STATE A COGNIZABLE "IMPLIED
        COVENANT" CLAIM. ............................................................................................... 22

VIII.   CONCLUSION ............................................................................................................. 25

## **Table of Authorities**

Page(s)

CASES

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ..........................................................................................9

*Automatic Canteen Co. of Am. v. FTC*,
  346 U.S. 61 (1953) ..........................................................................................12

*Balian Ice Cream Co. v. Arden Farms Co.*,
  231 F.2d 356 (9th Cir. 1955) ..........................................................................17

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ..........................................................................................9

*Cecil Corley Motor Co. v. Gen. Motors Corp.*,
  380 F. Supp. 819 (M.D. Tenn. 1974) ..............................................................21

*Continental Oil Co. v. Frontier Refining Co.*,
  338 F.2d 780 (9th Cir. 1964) ..........................................................................15

*Corn Products Refining Co. v. FTC*,
  324 U.S. 726 (1945) ...................................................................................14, 17

*Deas v. PACCAR, Inc.*,
  775 F.2d 1498 (11th Cir. 1985) ......................................................................21

*Dura Pharms., Inc.* v. *Broudo*,
  544 U.S. 336 (2005) ........................................................................................16

*Export Liquor Sales, Inc. v. Ammex Warehouse Co.*,
  426 F.2d 251 (6th Cir. 1970) ..........................................................................20

*FLM Collision Parts, Inc. v. Ford Motor Co.*,
  543 F.2d 1019 (2d Cir. 1976) ..........................................................................12

*FTC v. Morton Salt Co.*,
  334 U.S. 37 (1948) ..........................................................................................13

*Gen. Conference Corp. of Seventh–Day Adventists v. Seventh–Day Adventist Congregational Church*,
  887 F.2d 228 (9th Cir. 1989) ............................................................................9

*Gorlick Distrib. Cntrs., LLC v. Car Sound Exhaust Sys., Inc.*,
  723 F.3d 1019 (9th Cir. 2013) ........................................................................17

*Haggarty v. Wells Fargo Bank, N.A.*,
  2012 WL 4742815 (N.D. Cal. 2012) ...................................................................24

*Hinkleman v. Shell Oil Co.*,
  962 F.2d 372 (4th Cir. 1992) ...........................................................................20

*Hubbard Auto Ctr., Inc. v. Gen. Motors Corp.*,
  422 F. Supp. 2d 999 (N.D. Ind. 2006) ...............................................................21

*In re Gilead Scis. Sec. Litig.*,
  536 F.3d 1049 (9th Cir. 2008) .............................................................................9

*Integrated Storage Consulting Servs., Inc. v. NetApp, Inc.*,
  2013 WL 3974537 (N.D. Cal. 2013) ...............................................................3, 23

*Manteca Trailer & Camper, Inc. v. Roadtrek Motorhomes, Inc.*,
  2009 WL 54577 (E.D. Cal. 2009) .......................................................................21

*Petroleum Sales, Inc. v. Valero Refining Co.*,
  2006 WL 3708062 (N.D. Cal. 2006),
  *aff'd*, 304 F. App'x 615 (9th Cir. 2008)............................................................11

*Portland 76 Auto/Truck Plaza, Inc. v. Union Oil Co. of Cal.*,
  153 F.3d 938 (9th Cir. 1998) ....................................................................3, 19, 20

*PSA Group, LLC v. Nations Transaction Servs., Inc.*,
  2010 WL 3001634 (C.D. Cal. 2010)....................................................................23

*Rambus, Inc. v. Hynix Semiconductor Inc.*,
  629 F. Supp. 2d 979 (N.D. Cal. 2009) ............................................................ 24-25

*Rod Baxter Imports, Inc. v. Saab-Scania of Am., Inc.*,
  489 F. Supp. 245 (D. Minn. 1980).......................................................2, 11, 12, 13

*Smith Wholesale Co. v. R.J. Reynolds Tobacco Co.*,
  477 F.3d 854 (6th Cir. 2007) ...............................................................2, 10, 11

*Somers v. Apple, Inc.*,
  729 F.3d 953 (9th Cir. 2013) .............................................................................16

*Tri–Valley Packing Ass'n v. FTC*,
  329 F.2d 694 (9th Cir. 1964) .............................................................................11

*TV Signal Co. of Aberdeen v. Am. Tel. & Tel. Co.*,
  462 F.2d 1256 (8th Cir. 1972) ...........................................................................19

*Valley Plymouth v. Studebaker-Packard Corp.*,
  219 F. Supp. 608 (S.D. Cal. 1963).......................................................................19

*Volvo Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc.*,
    546 U.S. 164 (2006)...................................................................................................... *passim*

**STATUTES**

15 U.S.C. § 13(a) *et seq*. (the Robinson-Patman Act) ........................................................ *passim*

Cal. Veh. Code § 11713.3(a) ................................................................................................21, 22

**OTHER AUTHORITIES**

14 H. Hovenkamp, Antitrust Law ¶ 2333c (2d ed. 2006)...............................................................2

ABA SECTION OF ANTITRUST LAW, *Antitrust Law Developments* (7th ed. 2012) .........................20

## I.      INTRODUCTION.

Chrysler sells cars through a nationwide network of dealers.  Because of changes in demographics, customer preferences, and the local and national economy, this network constantly evolves, with dealers frequently opening, closing, or relocating.  Change, however, often meets resistance from incumbent dealers.  This case is about one such incumbent.

Plaintiff Mathew Enterprises owns and operates a Chrysler dealership in San Jose called Stevens Creek.  For a time, Stevens Creek served parts of Northern California all by itself.  In the aftermath of the financial crisis – which threatened the viability of the domestic automobile industry – a number of dealers voluntarily closed and terminated their agreements with Chrysler. Stevens Creek survived, but two dealers in its region did not.  As a result, Stevens Creek became the closest Chrysler dealership for a broad geographic area.  Its sales increased.  Stevens Creek does not complain about its good fortune during this time of upheaval.

Stevens Creek's exalted position in the area changed when Chrysler authorized a new dealership in San Leandro in December 2010 to replace one recently shuttered.  Nearby customers found the new dealership more convenient, and Stevens Creek's primary draw area, and its sales, decreased. A year and a half later, Chrysler authorized a second replacement dealership, this time in Fremont.  Stevens Creek's sales fell back to its original levels.

These "lost" sales prompted this suit.  Stevens Creek recognizes that neither antitrust nor contract law affords relief for losses attributable to Chrysler's authorization of replacement dealerships in San Leandro and Fremont. Neither body of law enshrines Stevens Creek as Northern California's Chrysler dealership monopolist.  As a result, Stevens Creek resorts to four novel and far-fetched alternative claims.  None have merit.

Stevens Creek's primary complaint is grounded in the antitrust laws.  At first blush, the invocation of competition law seems brazen; Chrysler *injected new competition* into Northern California by reestablishing its dealerships. Stevens Creek nonetheless seems to believe that the Robinson-Patman Act, or RPA, requires Chrysler to pay tribute to incumbents in exchange for the right to offer its customers convenience.  Stevens Creek is wrong.  *Volvo Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc.*, 546 U.S. 164, 181 n.4 (2006) ("Robinson-Patman does not bar a manufacturer from restructuring its distribution networks to improve the efficiency of its operations.").[1]

Specifically, Stevens Creek contends that Chrysler engaged in price discrimination against it by applying the terms of its *facially-neutral* dealer sales incentive program the *same way* before, and after, the reentry of dealerships in San Leandro and Fremont. Because these new dealerships apparently made it more difficult for it to hit its sales targets, Stevens Creek claims it should have been relieved of them.  In sum, the heart of Stevens Creek's price discrimination claim is that Chrysler failed to discriminate *in its favor* because Chrysler  administered its sales program even-handedly.

But the Robinson-Patman Act does not outlaw incentive programs, mandate equal profits, or require discrimination in favor of entrenched incumbents.  *See Smith Wholesale Co. v. R.J. Reynolds Tobacco Co.*, 477 F.3d 854, 879 (6th Cir. 2007) (the "very nature of an incentive program necessarily leads to different outcomes based on performance"); 14 H. Hovenkamp, Antitrust Law ¶2333c, p. 109 (2d ed. 2006) (Robinson-Patman Act does not afford "a guarantee of equal profit margins on sales actually made" ); *Rod Baxter Imports, Inc. v. Saab-Scania of*

---

[1]  Unless otherwise noted all emphasis is added, and internal citations and quotation marks omitted.

*Am., Inc.*, 489 F. Supp. 245 (D. Minn. 1980) (rejecting argument that auto manufacturer was obligated to alter its sales target methodology to account for a particular dealer's circumstances).

Stevens Creek next alleges that Chrysler, which is landlord to some of its dealerships, violated the RPA by charging San Leandro below-market rents. This claim is easily dispensed. Under controlling Ninth Circuit law, the RPA does not forbid the provision of favorable rent terms to a manufacturer's dealer or franchisee. *See Portland 76 Auto/Truck Plaza, Inc. v. Union Oil Co. of Cal.*, 153 F.3d 938, 941-42 (9th Cir. 1998).

Stevens Creek next claims that Chrysler violated the California Vehicle Code by failing to "make available" a different "mix" of cars to it. Had Chrysler provided a better mix, Stevens Creek claims, it would have been more likely to meet its sales targets under the incentive plan. There is little more to say about this claim, as Stevens Creek does not assert a single fact in support of it. For this reason alone, it should be dismissed.

As a last resort, Stevens Creek contends that Chrysler breached an "implied covenant of good faith and fair dealing" because it did not afford Stevens Creek special treatment following the reopening of the dealerships in San Leandro and Fremont. Stevens Creek alleges that it "expected" to receive incentive payments under its dealership agreement – whether it hit the required targets or not – and that fair dealing compels their payment. But the dealer agreement does not grant Stevens Creek any exclusive territory, a most favored nations provision, or a guaranteed right to incentives. Such rights cannot be implied. *Integrated Storage Consulting Servs., Inc. v. NetApp, Inc.*, 2013 WL 3974537, *7 (N.D. Cal. 2013) (Davila, J.) (implied covenant "cannot be extended to create obligations not contemplated by the contract.").

The Complaint should be dismissed.

## II.    ALLEGED FACTS.

The plaintiff, Mathew Enterprises, through its Stevens Creek location, is one of a number of dealers reselling Chrysler vehicles in Northern California.  Cmplt. ¶ 1.  In December 2010, Chrysler authorized a new dealership in San Leandro – 36 miles from Stevens Creek.  *Id.* ¶ 43. Stevens Creek alleges that "the establishment of San Leandro" caused many customers who would have "formerly found [Stevens Creek] to be most convenient" to now find San Leandro even "more convenient."  *Id.* ¶ 22.  Accordingly, Stevens Creek alleges that "the number of vehicles" it could "expect" to sell "significantly decrease[d]."  *Id*. ¶ 22.

But Stevens Creek does not allege that Chrysler endowed it with an exclusive territory, or that California vehicle franchise law forever protects its former monopoly.  It alleges instead that this loss of sales had an *ancillary* effect on its ability to earn incentives under Chrysler's sales incentive program.  *Id.*  As Stevens Creek asserts, in addition to an *identical* invoice price, Chrysler provides a per-vehicle incentive to dealers who meet their monthly sales targets.  *Id*. ¶ 17, 18.  These targets are based on the dealer's "previous year" sales.  *Id*. ¶¶ 19, 28.

Stevens Creek historically participated in Chrysler's sales incentive program, and enjoyed its benefits.  The problem, says Stevens Creek, is that in the year before San Leandro's entry, it was able to draw customers who lived near San Leandro.  Stevens Creek complains that its sales targets (going forward) were nonetheless based on its "past performance without taking into account" the impact of San Leandro's re-entry.  *Id.* ¶ 23. According to Stevens Creek, Chrysler was implicitly obligated to cave into its "repeated" requests for special treatment in the form of a suspension or reduction of its sales targets more quickly than it did.  *Id*. ¶ 26.

Specifically, Stevens Creek claims that, for just four months – December 2010 through March 2011 – it fell short of its sales targets and so did not earn incentives under Chrysler's standard program.  *Id*. ¶¶ 23-27.  For the rest of 2011, Stevens Creek *did* meet its targets.  In

some months (April through June 2011), it met its targets even *without* an adjustment reflecting the opening of San Leandro. *Id.* For the remainder of 2011 – July through December – Chrysler provided an adjustment at Stevens Creek's request. *Id.* All told, Stevens Creek alleges that it *earned* the incentives for eight out of the twelve months following San Leandro's entry.[2]

For the four seemingly random months it failed to qualify, however, Stevens Creek alleges that the incentive program was "functionally unavailable" to it. *Id.* But it does not assert facts supporting this contention. It does not state whether it missed its sales targets by one car each month, or by fifty. It does not explain why the sales incentives were functionally *available* during some months of the year after San Leandro's entry (when Stevens Creek hit its targets) but functionally *unavailable* during other months (when Stevens Creek missed its targets).

As to injury, Stevens Creek alleges that it lost sales because it failed to earn these incentives, and suggests that it lost at least some of them to San Leandro, which did earn the incentives. But it does not support this claim. It does not, for example, provide a basis for inferring that customers chose San Leandro over Stevens Creek *because of price* – *i.e.*, because San Leandro was cheaper, and not just more convenient.

There is no allegation that customers deciding between the two dealerships knew of any price differences between the two dealerships, or of their relative willingness to negotiate. For example, there is no allegation that the two dealerships advertised different prices side-by-side in the newspaper, one reflecting a pass-through of expected future incentive payments, and the other one not. Nor is there any allegation that customers actually visited both dealerships, negotiated the prices of the same or similar vehicles with each of them, and then chose San

---

[2] The period after December 2011 is irrelevant for purposes of determining the impact of San Leandro's opening on Stevens Creek's vehicle incentive eligibility because – as alleged – the benchmark is based on prior year's sales, and thus, automatically adjusts within one year to reflect changes in the dealer network.

Leandro over Stevens Creek because the former was willing to pass on some portion of the sales incentives it expected to earn at the end of the month.  Put simply, there is no factual allegation to support any inference of head-to-head competition or ***sales diverted because of price***.

All Stevens Creek alleges is that it failed to meet its sales targets, and its non-receipt of special treatment must be to blame.  Unwilling to point the finger at the logical cause of its depressed sales – San Leandro's convenience – and unable to make out a real price diversion allegation, Stevens Creek offers "in the alternative" a *third* hypothesis for its failure to meet the sales targets.  *Id*. ¶ 4.  It alleges that, after San Leandro opened, Chrysler "did not make available … a sufficient number of Vehicles in the appropriate mix of models that [it] needed to meet" its benchmarks.  *Id.* ¶ 24.  Thus, while its convenience and pricing hypotheses were grounded on a lack of *demand* for its vehicles, the third hypothesis identifies (somewhat inconsistently) a lack of *supply* as the culprit.

Stevens Creek does not support this assertion with a single fact.  It does not allege that it ordered certain vehicles, but Chrysler failed to deliver them.  For example, it does not claim it ordered a Chrysler Town & Country (a minivan), but received a Chrysler 200 (a sedan).  It does not identify *any* specific vehicles that Chrysler failed to "make available," or specify what an "appropriate mix" would be.  It does not allege that the vehicles it supposedly wanted more of were available for delivery, but unreasonably withheld.  It does not allege that Chrysler treated Stevens Creek differently than any other dealer in the area, in California or nationwide.  It does not allege that it did not receive enough vehicles to run its dealership profitably.  Nor does it explain why, if Chrysler receives the same invoice price from all dealers for its cars, *id.* ¶ 17, Chrysler would have any reason to willfully fail to satisfy its orders.

Stevens Creek's complaint about San Leandro's entry does not stop with its alleged impact on Steven Creek's award of incentives.  Stevens Creek also alleges that Chrysler Realty, which owns the land on which San Leandro is located, rented it to San Leandro at "below-market" rates to facilitate San Leandro's entry into the market.  *Id.* ¶ 42.  Ignoring any differences in the timing of the leases, the features of the property, or changes in the real estate market, Stevens Creek claims that although it "also leases its dealership facility from Chrysler Realty, Chrysler has not made similar … rent incentives available" to it.  *Id.* ¶ 46.  But Stevens Creek does not allege, as relevant under the Robinson-Patman Act, that the amount of the alleged rent reduction varies based on the number of vehicles purchased or sold by San Leandro.

San Leandro is not the only replacement dealership subject to Stevens Creek's ire.  In July 2012 (about a year and a half after the opening of San Leandro), Chrysler authorized a replacement dealership in Fremont – 14 miles from Stevens Creek.  *Id.* ¶ 29-31.  Other than the same conclusory grievance about the failure to make "an appropriate mix" of vehicles available to Stevens Creek, *see id.* ¶ 31, the complaint about Fremont is limited to Chrysler's alleged refusal to make an "adjustment" to Stevens Creek's sales targets during the new dealership's first year in business.  Specifically, Stevens Creek claims that Chrysler's program again became "functionally unavailable" between July 2012 and June 2013 because it did not earn certain incentives during that time.  *Id.* ¶ 32.

But Stevens Creek does not contend that the program was "functionally unavailable" for any other incumbent dealer.  For example, Fremont sits between San Leandro and Stevens Creek.  Yet San Leandro "continued to receive" incentives even though, by that point, its sales targets were based on prior year's sales, just like Stevens Creek's.  *Id.* ¶ 33.

Nonetheless, Stevens Creek asserts that it alone is entitled to special treatment to reflect Fremont's entry. This is warranted, it claims, because its sales decreased by 33%. *Id.* ¶ 56. Stevens Creek attributes, as it must, "some of this reduction" to convenience and the simple addition of a *third* dealer into a two dealer service area. *Id.* ¶ 57-59. But it postulates that it lost some sales because, from time to time, it missed its incentive payments. *Id.*

It does not allege, however, that such sales were *diverted* to San Leandro or Fremont because of *price*. Stevens Creek itself provides a more likely explanation: once Stevens Creek predicts, at the *beginning* of each month, that it *might* not meet its sales targets at the *end* of each month, it gives up trying and *chooses* not to "compet[e] as aggressively" on price in favor of earning more "profit" on each vehicle sold. *Id.* ¶¶ 69-70. This may establish that Stevens Creek sells fewer cars when it raises prices, and more cars when it lowers prices. But it does not establish **diversion** – that the sales it lost when it raised price went to San Leandro or Fremont.

Stevens Creek also alleges no facts to support its contention that Chrysler's failure to make an exception to its policy "substantially lessened competition" among the dealers. *Id.* ¶ 70. Stevens Creek admits that it continues to make substantial sales, retaining a 33% share of sales among it and the two new dealers, even during the months it *failed* to earn the incentives. *See id.* ¶ 56. It does not contend that it has ever been unprofitable, either during the months it failed to earn the incentives, or at any other time.

Today, Stevens Creek concedes that it competes effectively against the two new dealerships and for new car sales more generally. It acknowledges that – now – Chrysler's dealer incentive program is functionally available. Its sales targets have automatically readjusted to account for the impact of San Leandro and Fremont's entry into its service area. It continues

to gain sales and take advantage of Chrysler's facially-neutral dealer incentive program. Competition is therefore thriving; it has not been injured, destroyed, or prevented.

## III.   STANDARD OF REVIEW.

The Court is familiar with the standard of review on a motion to dismiss brought under Rule 12(b)(6). Well-pled, plausible allegations should be credited. Conclusory, implausible, or unsupported allegations should not. *See Gen. Conference Corp. of Seventh–Day Adventists v. Seventh–Day Adventist Congregational Church*, 887 F.2d 228, 230 (9th Cir. 1989); *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008). Unless the credited allegations are enough "to raise a right to relief above the speculative level" and delineate a claim that is "plausible on its face," the Court should dismiss the Complaint. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## IV.   CHRYSLER DID NOT VIOLATE THE ROBINSON-PATMAN ACT BY DECLINING TO ADJUST STEVENS CREEK'S SALES TARGETS.

Stevens Creek alleges that Chrysler violated the Robinson-Patman Act because "Chrysler did not adjust [Stevens Creek's] monthly sales objectives to account for the establishment of San Leandro" and Fremont. Cmplt. ¶ 23. But Stevens Creek acknowledges that Chrysler's incentive program is facially-neutral, applying the ***same methodology*** for all existing dealers. The question is whether the RPA required Chrysler to forego its even-handed approach when setting Stevens Creek's sales targets. It does not.

As the Supreme Court recently explained, "Robinson–Patman does not 'ban all price differences charged to different purchasers of commodities of like grade and quality.'" *Volvo*, 546 U.S. at 176. It is well-settled that price differences of the kind at issue here – those generated through sales promotions – are lawful and procompetitive, though they inevitably

"lead[] to different outcomes based on performance." *Smith Wholesale Co. v. R.J. Reynolds Tobacco Co.*, 477 F.3d 854, 865-66, 879 (6th Cir. 2007) (collecting cases).

Accordingly, sales incentive programs are only subject to scrutiny if they are "functionally available" ***in the antitrust sense*** to some dealers, but not to others. Even then, the scrutiny will end unless the differential pricing is likely to "substantially" limit, or "injure, destroy, or prevent competition" between the favored and disfavored dealers. *Id*. at 862; *see also* 15 U.S.C. § 13(a). To satisfy this element, a plaintiff must plausibly allege "a *significant* price reduction over a *substantial* period of time." *Volvo*, 546 U.S. at 177.

Stevens Creek's hit and miss performance against its sales targets after the reestablishment of dealer locations in San Leandro and Fremont does not establish (i) that Chrysler's incentive program was functionally unavailable to Stevens Creek, or (ii) that failure to afford Stevens Creek special treatment "injured, prevented, or destroyed" competition among Northern California Chrysler dealers.

### A.  Stevens Creek Failed to Allege That Chryslers' Incentive Program Was "Functionally Unavailable."

Stevens Creek does not allege that it was denied the opportunity to participate in Chrysler's dealer incentive program. In fact, it regularly participated in the program and, with few exceptions, received substantial incentives. Cmplt. ¶¶ 27, 34. Between 2011 and 2012, for example – after the entry of San Leandro – Stevens Creek alleges it received over $1 million in incentives. *Id*.

Nor does Stevens Creek allege that Chrysler applied the program differently to it than to other dealers, or that the methodology Chrysler used varied among competing dealers. Instead, Stevens Creek contends that the program was "functionally unavailable" only for the months it failed to qualify for the program's incentives. *Compare id.* ¶ 25 (program *unavailable* from

December 2010 to March 2011); *with* ¶ 27 (program *available* "through June 2012"); ¶ 32 (program *unavailable* after "July 2012").[3]

The allegation of unavailability is critical.  If deficient, Stevens Creek's price discrimination claim fails.  *See Tri–Valley Packing Ass'n v. FTC,* 329 F.2d 694, 703-04 (9th Cir. 1964) (if "lower price … is available to the nonfavored buyer," price difference cannot give rise to a "probability of competitive injury"); *Petroleum Sales, Inc. v. Valero Refining Co.*, 2006 WL 3708062, \*20 (N.D. Cal. 2006), *aff'd*, 304 F. App'x 615 (9th Cir. 2008) (applying functional availability defense); *Smith*, 477 F.3d at 866-67 (functional unavailability is an element of plaintiff's claim, not an affirmative defense).

In determining whether an incentive program is functionally available, the test is *not* whether some dealers earned the incentives, while others did not.  A manufacturer "may utilize promotional arrangements and provide financial incentives to favor its product or even to disfavor competing brands, and manufacturers need not guarantee that all customers benefit to the same degree."  *Smith*, 477 F.3d at 866.  Such a program, by definition, "will lead to different outcomes for different purchasers."  *Id.*

An incentive program is functionally unavailable only if it was not reasonably applied in an even-handed manner.  As one court explained in a similar car dealer incentive case, "if the program was a fair one, it would not likely have had the effect of limiting competition, but in fact would likely have fostered competition."  *Rod Baxter Imports*, 489 F. Supp. at 249.  As the Second Circuit similarly explained in upholding Ford's dealer incentive program, even though it may not "set a single uniform price for all types of sales," it does not violate the Act if

---

[3] Stevens Creek has not alleged that the methodology used to set the initial sales targets for *new* dealers is unreasonable, or that San Leandro or Fremont should have been barred from the program before their sales history had been established.  It alleges only that its own sales targets should have been adjusted.  Thus, the issue here is only whether the RPA imposes such a duty.

"administered with an even hand, without any discrimination among the dealers."  *FLM Collision Parts, Inc. v. Ford Motor Co.*, 543 F.2d 1019, 1024-25 (2d Cir. 1976).

Stevens Creek concedes that Chrysler administered the program evenhandedly by basing each dealer's sales targets on that dealer's prior year's sales history.  Nonetheless, it argues that a program that is ordinarily functionally available *becomes* unavailable if extenuating circumstances render evenhanded management "unfair."  But it does not appear that any court has adopted such a rule, and for good reason.

There will *always* be dealers that, because of all variety of market dynamics (including just plain bad luck), may not qualify for an incentive from time to time.  A rule mandating single-dealer exceptions to facially-neutral policies to account for extenuating circumstances would create a morass for manufacturers, dealers, and courts.  Every month, these entities would need to analyze, on a location by location basis, whether circumstances justify a benchmark adjustment, and the level of adjustment that will restore the incentive program to lawful status.  In practice, procompetitive sales incentives programs would disappear from the marketplace.  *See Automatic Canteen Co. of Am. v. FTC*, 346 U.S. 61, 63 (1953) (warning that overbroad interpretation of the RPA would wrongly "give rise to a price uniformity and rigidity in open conflict with the purposes of other antitrust legislation.")

Fortunately, other courts have considered, and rejected, Stevens Creek's argument.  In *Saab*, the court rejected a dealer's contention that a sales incentive program violated the Act because its sales targets were based on the dealer's prior three month's sales history.  The dealer claimed that this metric was "unfair because the quotas were based on too short a period of time," coincided with its busy season, and disadvantaged it versus other competing dealers, because it overstated its sales potential.  *Rod Baxter Imports*, 489 F. Supp. at 249.  The court

disagreed because "[t]he same period was used for all dealers." *Id.* As it explained, that "some dealers would have been better or worse off if a longer base period was used, does not … establish that the program was unfair or that it may have had the effect of substantially limiting competition." *Id.*

To be sure, a facially-neutral program could conceivably be structured in a manner that insidiously provides favored, powerful resellers with an inherent, permanent advantage over another class of resellers. *Cf. FTC v. Morton Salt Co.*, 334 U.S. 37, 42 (1948). And it may be – though no court has ever so ruled – that a program administrator's chronic failure to address extenuating circumstances could render a neutral program discriminatory if such failure yields systemic bias in favor of a specific class of resellers.

But the Court need not apply this thought experiment to Chrysler's program. Because it is based on a dealer's *own* prior year's sales, the program cannot be inherently biased against big dealers, small dealers, or any other class of dealers. Systemic changes in a dealer's situation are automatically accounted for in sales targets set for the following year. Where, as here, "there is no evidence that any favored purchaser possesses market power," where "favored purchasers" bear "little resemblance to" the power buyers the RPA was enacted to discipline, and where selective, favorable pricing "fosters competition among suppliers," courts should "construe the Act 'consistently with broader policies of the antitrust laws'" and reject the challenge. *Volvo*, 546 U.S. at 181.

### B.   Stevens Creek Failed to Allege that Chrysler's Incentive Program Threatens to Substantially Injure, Destroy, or Prevent Competition.

The Robinson-Patman Act protects competitors from deep, life-threatening wounds, not bumps and bruises. Unless courts are vigilant in distinguishing the first type of injury from the second, they risk interpreting the RPA inconsistently with the "broader policies of the antitrust

13

laws." *Volvo,* 546 U.S. at 181. Those policies are not "geared more to the protection of existing competitors," but to "the stimulation of competition." *Id.* The RPA is, therefore, properly construed as a means to foster competition, not as a "departure from" it. *Id.* at 180-81.

To ensure an RPA claim advances, rather than stifles, competition, courts require plausible allegations that the plaintiff's rivals received "a *significant* price reduction over a *substantial* period of time." *Volvo,* 546 U.S. at 177 (discussing the *Morton Salt* presumption). *If* such allegations are made, *and* such allegations are tied plausibly to the plaintiff's losses, *then* a court may "infer" that the "probable" effect of the price discrimination (if proven) was to "substantially" reduce, "or to injure, destroy, or prevent competition." *See* 15 U.S.C. § 13(a); *Corn Products Refining Co. v. FTC,* 324 U.S. 726, 738 (1945) (RPA does not "prohibit discriminations having 'the mere possibility' of [adverse] consequences," but reaches only those that "***probably*** have the defined effect on competition.").

The corollary is, in the absence of plausible allegations of serious harm, "[n]o inference of injury to competition is permitted." *Volvo,* 546 U.S. at 180. Accordingly, a plaintiff must establish that (i) significant sales were diverted to favored purchasers because of the price differential; and (ii) these lost sales were of sufficient magnitude to substantially injure, destroy, or prevent retail competition. Stevens Creek's allegations do not suffice.

### 1. Chrysler's Sales Incentive Program Did Not Divert Sales.

As *Volvo* teaches, the "hallmark of the requisite competitive injury" in RPA cases "is the ***diversion*** of sales or profits from a disfavored purchaser to a favored purchaser." *Volvo,* 546 U.S. at 177. Absent *price competition* between the two, there can be no diversion of sales or profits, and no competitive injury. *Id.* Therefore, to trigger the *Morton Salt* presumption – that sales diversion caused by a substantial and sustained price differential *injured competition* – a

plaintiff must first plausibly allege significant diverted sales.  This requires allegations of "a causal connection between the price discrimination and the alleged injuries."  *Continental Oil Co. v. Frontier Refining Co.*, 338 F.2d 780, 782 (9th Cir. 1964).

Stevens Creek's causal link claim is deficient because there is no allegation that significant sales were diverted from Stevens Creek to San Leandro or Fremont **because of price**. Stevens Creek offers two reasons for why its sales declined, but neither establishes price-related diversion.

*First*, it says San Leandro's and Fremont's entry into Stevens Creek's service area caused its sales to decline because the new dealers were more convenient to a significant portion of the population.  This may be diversion.  And it may be substantial.  But it is not diversion attributable to price discrimination.  The mere *existence* of rivals is probative of nothing.

*Second*, it claims that it *chose* to be less "aggressive[]" on price because it did not expect to meet its sales targets and wanted to continue making a "reasonable profit."  Cmplt. ¶ 69-70. But this is an allegation of consumer price-sensitivity, not diversion.  There is no allegation that price-sensitive customers turned away by Stevens Creek got in their cars and tried their luck with San Leandro or Fremont.  They may have gone to a Ford, GM, or Toyota dealership, or they may have delayed their purchasing decision until a better deal materialized.

But the mere fact that a dealer sells more cars when it lowers price than when it raises them is a testament to the laws of economics, not an indication of unlawful *diversion*.  The hole in Stevens Creek's logic is not cured by an allegation that San Leandro's sales increased at the same time Stevens Creek's decreased.  This too is an allegation of price-sensitivity, not diversion.  A dealer in New York that earns and passes along incentives may sell more cars than a dealer in California that does not.  But that does not mean that sales were diverted from one to

the other.  Likewise, San Leandro may have used its incentives to increase its sales, but that does not mean that those sales were taken from Stevens Creek.

Ultimately, Stevens Creek's two alleged reasons (convenience and price-sensitivity) – each of which suffice to explain the alleged sales patterns – render any inference of *price diversion* implausible.  When there are "obvious alternative explanations" for an alleged loss – one anticompetitive, the others procompetitive – a complaint fails to state a claim unless there are non-conclusory *facts* that point to the former *and* tend to exclude the latter.  *See Dura Pharms., Inc.* v. *Broudo*, 544 U.S. 336, 338 (2005) (sufficient allegations of "loss causation" require more than tort and loss; link must be plausibly stated); *Somers v. Apple, Inc.*, 729 F.3d 953, 963-66 (9th Cir. 2013) (causation is a "substantive element" of an antitrust claim and is inadequately pled if there are "obvious alternative explanations").

Here, any allegation of price diversion would be inherently implausible.  There is no allegation, for example, that customers selected which dealership to visit based on some imputed knowledge about the dealer more likely to earn future price incentives at the end of the month, or to be more price-competitive at the beginning of it.  (As everyone who has bought a car knows, dealers do not frequently, if ever, disclose what they truly pay for a vehicle or the minimum price they would accept for the car).  Nor is there any allegation that customers went through the arduous process of negotiating with each dealer over a similar vehicle and then chose to go with the lower priced one.  The lack of diverted sales is fatal to Stevens Creek's claim.

### 2.    Any Sales Diversion Did Not Substantially Injure Competition.

Even if Stevens Creek had alleged some price-based sales diversion during the few months it failed to earn incentives, such diversion could not have injured competition. The temporary blip on Stevens Creek's profit and loss statement the Complaint describes does not

16

suggest that competition was "probably" destroyed because Stevens Creek *periodically* missed incentive payments. *Balian Ice Cream Co. v. Arden Farms Co.*, 231 F.2d 356, 368 (9th Cir. 1955) ("deleterious consequences" required under RPA); *Corn Products*, 324 U.S. at 738 (consequences must be "probable," not just "possible")

Stevens Creek does not allege that its viability was threatened, or that Chrysler's incentive program gives a permanent systemic advantage to San Leandro or Fremont. It merely alleges that it lost sales to San Leandro and Fremont. But even so, Stevens Creek still maintained a 33% share, and continued to operate profitably in the market. *Id*. ¶ 56.

It is no answer to point to the conclusory assertion that there have been "substantial price differences … over a significant period of time [that] have substantially lessened competition." Cmplt. ¶ 54. Such a threadbare allegation is nothing more than a formulaic recitation of the elements of the claim, exactly the type of pleading *Twombly*, *Iqbal,* and their progeny reject.

The "substantiality" and "sustainability" elements of the *Morton Salt* presumption require more. They are measured by the discount's likely impact on the ***structure*** of the retail market. The Act and the presumption were intended to put the brakes on pricing policies that reflect a substantial *systemic* bias in favor of one class of retailers over another – a bias that relegates the disfavored purchasers to a niche corner of the market while increasing *concentration* among ever fewer, and larger, favored retailers. *See Volvo*, 546 U.S. at 178 (courts should not "permit an inference of competitive injury" where "there is no discrete 'favored' dealer comparable to a chainstore or a large independent department store."); *Gorlick Distrib. Cntrs., LLC v. Car Sound Exhaust Sys., Inc*., 723 F.3d 1019, 1021 (9th Cir. 2013) (The RPA "targets the perceived harm to competition occasioned by powerful buyers that have [more] ***clout*** … than smaller buyers.").

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Here, Stevens Creek has not asserted that any differences in incentive payments could have threatened the market *structure* for sales of new Chrysler vehicles.  To the contrary, Stevens Creek is the longtime incumbent trying to fend off entry or, failing that, demanding a suspension of the program rules because those rules allegedly made it a little easier for new entrants to obtain a toehold in territory Stevens Creek was used to dominating.  But the *Morton Salt* presumption was not intended as a compensation regime for entitled incumbents.

Chrysler's incentive program simply does not confer a systemic benefit on any class of dealer.  As in *Volvo*, its policy is even-handed, and is one in which Stevens Creek may "on occasion" get "a better deal" than the supposedly favored dealers.  *Volvo*, 546 U.S. at 178 (noting that the Act was not designed to prohibit such programs).  Indeed, since Chrysler's incentive program is based on prior year's sales, what goes around comes around.  If sales *were* diverted to the new dealers because Stevens Creek failed to qualify for incentives, in the next year the advantage will swing back to Stevens Creek.  *It* will be the dealer with the *lower* benchmark, while the former newcomers will have inflated benchmarks based on a sales period in which they earned incentives and Stevens Creek did not.  This is an inherent feature of a benchmark-based incentive program, not of the kind of improper favoritism the RPA targets.

To condemn such a program – one that unambiguously promotes long-run interbrand and intrabrand competition – based on flimsy allegations of short-term *lost*, not *diverted*, sales would disserve customers and competitors alike.  It would also wreak havoc.  Every dealer that fails to meet a benchmark could then bring a treble damages claim, asserting that it deserved an exception, or that one of its competitors did not.  The result would be the end of incentive programs that, like the one here, stimulate competition.

## V.    CHRYSLER DID NOT VIOLATE THE ROBINSON-PATMAN ACT BY OFFERING SAN LEANDRO FAVORABLE RENT TERMS.

Stevens Creek alleges that Chrysler violated the Robinson-Patman Act by leasing to San Leandro the land (and improvements) on which its dealership is located at "below-market" rates. Cmplt. ¶ 42.  Stevens Creek claims this violates Sections 2(a), 2(d), and 2(e) of the RPA.  *Id.* ¶ 47, 76.  Stevens Creek is wrong.  Real estate agreements are *not* covered by the Act.

Section 2(a) only prohibits **price** discrimination in connection with the sale of commodities of like grade and quality.  Rental agreements – whether above or below "market rates" – do not fall within this provision because land is not a "commodity."  *TV Signal Co. of Aberdeen v. Am. Tel. & Tel. Co.*, 462 F.2d 1256, 1259 (8ᵗʰ Cir. 1972) ("a real estate transaction … is not a commodity within Robinson-Patman.").  Parcels of land are inherently of *unlike* grade and quality – just consider the common saying that "location is everything."  Any comparison of San Leandro's and Stevens Creek's rental terms is inappropriate because these are not "analogous transactions under comparable market conditions at approximately the same time." *Valley Plymouth v. Studebaker-Packard Corp.*, 219 F. Supp. 608, 611, 613 (S.D. Cal. 1963).

More importantly, rental terms charged for a dealer's facilities do not constitute a part of the *price* charged for the vehicle.  There is no allegation, for example, that the rent charged to San Leandro was tied to the volume of cars it purchased for resale.  This deficiency is not cured by characterizing a favorable rental term as a "disguised discount."  While "[s]everal subsections of the [RPA] deal with disguised discounts," Section 2(a) is not one of them.  *See Portland 76*, 153 F.3d at 941-42.

Section 2(d) also does not apply. That provision addresses situations in which a manufacturer "**pays**" its dealer for promotional services or facilities that the dealer provides in connection with the resale of the product.  For example, if a manufacturer pays a dealer for

featuring a particular car in the dealer's newspaper advertisements, circulars, or TV ads, such *payments* would be covered by Section 2(d).  See ABA SECTION OF ANTITRUST LAW, *Antitrust Law Developments*, at 546-47 (7th ed. 2012) (discussing scope of § 2(d)).  Here, Chrysler is not paying San Leandro for promotional services San Leandro provides, or for facilities ***San Leandro*** owns and furnishes.  Rather, San Leandro is paying ***Chrysler*** rent for property Chrysler owns.  Section 2(d)'s plain text does not concern itself with payments flowing in this direction.

Chrysler's rental terms also do not violate Section 2(e).  That provision addresses the provision of "facilities" to customers, but ***excludes*** rental realty from the definition of "facility." The Ninth Circuit's decision in *Portland 76* controls.  As the court explained, Section 2(e)'s coverage of "facilities connected with … resale" is ambiguous.  *See Portland 76*, 153 F.3d at 942-43.   After analyzing the provision's legislative history, FTC interpretations, and other authorities, the court then definitively held that "realty leased to a purchaser of goods for resale, by [a manufacturer], is not 'facilities connected with' the sale in the sense of the Robinson-Patman Act."  *Portland 76*, 153 F.3d at 946; *see also Export Liquor Sales, Inc. v. Ammex Warehouse Co.*, 426 F.2d 251, 252 (6th Cir. 1970) (same); *Hinkleman v. Shell Oil Co.*, 962 F.2d 372, 380 (4th Cir. 1992).  Stevens Creek's rental claims should be dismissed.

## VI.   STEVENS CREEK FAILED TO STATE A COGNIZABLE "FAILED DELIVERY" CLAIM.

Stevens Creek's claim that Chrysler failed to deliver vehicles "in reasonable quantities" must be dismissed.  Cmplt. ¶¶ 78-84.  Stevens Creek does not allege that it ordered any vehicles that Chrysler failed to deliver.  It does not allege that Chrysler treated Stevens Creek's orders differently than orders from other dealers.  It does not allege that it was deprived of the vehicles it needed to profitably operate its dealership.  It does not allege that Chrysler failed to deliver vehicles in accordance with its dealer agreement.  And it does not allege that any (imagined)

delivery failure was within Chrysler's control.  In fact, Stevens Creek does not actually allege ***any facts*** relating to its failed delivery claim.

California dealer franchise law prohibits "any manufacturer" from "fail[ing] to deliver in *reasonable quantities ... after receipt of an order* from a dealer … a new vehicle ... if the vehicle … [is] publicly advertised as being *available for delivery* or *actually being delivered*," unless "the failure is caused by acts or causes beyond the control of the manufacturer."  Cal. Veh. Code § 11713.3(a).  Stevens Creek was therefore required to allege (i) that it "ordered" vehicles that Chrysler "failed" to deliver; (ii) that undelivered vehicles were advertised as being "available" for delivery or were actually being delivered; and (iii) Chrysler's failure to deliver these vehicles in sufficient quantities was "unreasonable."  *See, e.g., Cecil Corley Motor Co. v. Gen. Motors Corp.*, 380 F. Supp. 819, 835 (M.D. Tenn. 1974) (noting three-part test under similar statue); *Deas v. PACCAR, Inc.*, 775 F.2d 1498, 1507-08 (11th Cir. 1985) (same).  Stevens Creek does allege ***any*** of the elements.

*First*, Stevens Creek does not allege that it placed an order that Chrysler failed to fulfill. This fatal deficiency compels dismissal. *Manteca Trailer & Camper, Inc. v. Roadtrek Motorhomes, Inc.*, 2009 WL 54577, *1 (E.D. Cal. 2009)  ("[u]nder section 11713.3(a), liability is predicated upon a manufacturer's failure to act 'after receipt of an order from a dealer;'" thus, the failure to allege an "order" for "specific vehicles … with which [the manufacturer] failed to comply" warrants dismissal); *Hubbard Auto Ctr., Inc. v. Gen. Motors Corp.*, 422 F. Supp. 2d 999, 1002 (N.D. Ind. 2006) (the "plain language" of a nearly identical Indiana statute "clearly requires ... receipt" of an order "before any violation can occur.").

*Second*, Stevens Creek does not allege that vehicles it desired were *available* for delivery or were being delivered to other dealers.  Having failed to identify any specific vehicles that

Chrysler failed to deliver, Stevens Creek cannot – and does not – allege that these hypothetical vehicles were "publicly advertised as being available or were actually being delivered." This element is critical. In the automobile industry, there will always be models for which demand outstrips supply, and vice-versa. Dealers will always want the high-demand vehicles, which take less effort to sell, and rational manufacturers will want to meet that demand, *if they are able.* Reasonableness in allocating supply, therefore, depends on specific allegations of availability.

*Third*, Stevens Creek does not allege that Chrysler failed to deliver "reasonable quantities" of vehicles. Stevens Creek alleges only that Chrysler did not "make available … a sufficient number of vehicles in the appropriate mix of models that [it] needs to meet the monthly objectives established by Chrysler." Cmplt. ¶ 24. But this *characterization* does not establish that Chrysler failed to deliver available vehicles in *reasonable* quantities. The statute does not define "reasonableness" according to sales targets a given dealer needs to earn performance incentives. Were that the case, any dealer that missed a sales target could complain that Chrysler violated § 11713.3(a) by not delivering a "better" mix of cars. Dealers are supposed to promote all of Chrysler's vehicles covered by their dealer agreement(s), so their sales performance does not dictate whether Chrysler reasonably fulfilled their orders. Accordingly, Stevens Creek's state franchise law claim should be dismissed.

## VII. STEVENS CREEK FAILED TO STATE A COGNIZABLE "IMPLIED COVENANT" CLAIM.

Stevens Creek also asserts that Chrysler breached the "implied duty of good faith and fair dealing" by maintaining Stevens Creek's sales targets after the San Leandro and Fremont opened. But the implied covenant does not require this.

Under California law, the "implied covenant … is limited to assuring compliance with the ***express terms of the contract***, and cannot be extended to create obligations not contemplated

22

by the contract." *Integrated Storage Consulting Servs.*, 2013 WL 3974537, at \*7.  Here, Stevens Creek does not allege that its agreement contains (i) an exclusive territory provision; (ii) a most favored nations provision; or (iii) a right to receive performance payments regardless of performance.  These provisions cannot be implied.

The absence of these provisions is fatal to Stevens Creek's claim because its ***entire*** injury stems from Chrysler's decision to authorize two new dealers.  Stevens Creek contends that the new entrants enhanced customer convenience, causing it to lose sales, sporadically miss sales targets, and lose out on associated incentive payments. The covenant Stevens Creek needed to avoid such losses would have been one that conferred it with an exclusive territory.  But the implied covenant cannot endow it with this benefit. *See id.* at \*8 (dismissing claim because "implied" exclusivity was inconsistent with express grant of *non-exclusive* rights).

Seeking backdoor exclusivity, Stevens Creek argues that Chrysler had a duty to *mitigate* the impact of new dealer entry by adjusting its sales targets.  Its failure to do so, Stevens Creek claims, frustrated its "expectations."  But, as the Central District of California explained,

> [i]t is not enough to say that without the proposed implied covenant, the contract would be improvident or unwise or would operate unjustly. Parties have the right to make such agreements. The law refuses to read into contracts anything by way of implications except upon grounds of ***obvious necessity***.

*PSA Group, LLC v. Nations Transaction Servs., Inc.*, 2010 WL 3001634, \*4 (C.D. Cal. 2010).

There is no "obvious necessity" that requires Chrysler to grant an exception to it facially-neutral incentive program.  Even if there were, an "implied" duty cannot be read into the contract because the parties' dealership agreement ***expressly vests discretion*** in Chrysler to determine when – in its "judgment" or "opinion" – it should modify a dealer's sales targets:

> Upon DEALER's written request, CC may adjust DEALER's Minimum Sales Responsibility, ***if appropriate in CC's judgment***, to take into account ***extraordinary*** local conditions to the extent, ***in CC's opinion***, such conditions are beyond DEALER's control and have affected DEALER's sales performance

1  differently from the sales performance of other new vehicle dealers in DEALER's
   Sales Locality….

2  *See* Declaration of S. Handmaker Ex. A, at p. 3; Ex. B, at p. 3.

3      This provision precludes liability under an implied covenant theory. Any other result

4  would eradicate Chrysler's bargained-for right to decide which circumstances qualify as

5  extraordinary, and which do not. *See Haggarty v. Wells Fargo Bank, N.A.*, 2012 WL 4742815,

6  *5 (N.D. Cal. 2012) (clause that *expressly* allows to decision to make decision in its sole

7  discretion "insulates" defendant from claim, under an implied covenant theory, that "it was

8  required to reach a particular conclusion") (citing cases).  And it would defeat a core pillar of the

9  program:  if Chrysler was subject to a lawsuit every time it decided to grant an exception and

10 every time it did not, it might simply decide not offer an incentive program at all.

11     Here, Chrysler had ample reason ***not*** to grant an exception to its facially-neutral dealer

12 incentive program.  In the aftermath of San Leandro's entry, Stevens Creek hits its targets in

13 some months, and missed it in others.  An exception for all such months would have likely

14 depressed Stevens Creek's incentives to hit its targets.  After Fremont's entry, San Leandro was

15 able to qualify for incentives though its benchmarks were calculated in the same manner as

16 Stevens Creek's and it was also impacted by Fremont's entry.  This again suggests that

17 suspending benchmark requirements would likely depress sales.

18     Taking a different tack, Stevens Creek alleges that Chrysler frustrated its expectation

19 because it should not have (i) provided sales incentives to San Leandro and Fremont unless it too

20 received them; or (ii) charged San Leandro better rental rates than it received.  Cmplt. ¶ 88.  But

21 Stevens Creek does not allege that its *dealer agreement* prevents price discrimination, guarantees

22 equal profits among dealers, or affords Stevens Creek most favored nations protection.  Such

23 provisions must be expressly bargained for; they cannot be implied *sub silencio*.  *See Rambus,*

*Inc. v. Hynix Semiconductor Inc.*, 629 F. Supp. 2d 979, 1014 (N.D. Cal. 2009) (implied covenant did not require defendant to offer plaintiff "most favored licensee" status).

## VIII.   CONCLUSION

For all the foregoing reasons, Chrysler's Motion should be granted and Stevens Creek's case be dismissed *with prejudice*.

DATED: November 12, 2013

Respectfully submitted,

/s/   *Colin R. Kass*

Colin R. Kass, admitted *pro hac vice*
Scott M. Abeles, admitted *pro hac vice*
Sally M. Handmaker, SBN 281186
PROSKAUER ROSE LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2533
T: (202) 416-6800
F: (202) 416-6899

Robert E. Davies, SBN 106810
DONAHUE DAVIES LLP
P.O. Box 277010
Sacramento, CA 95827-7010
T: (916) 817-2900
F: (916) 817-2644

*Attorneys for Defendant*
Chrysler Group LLC

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### **CERTIFICATE OF SERVICE**

I, Colin R. Kass, hereby certify that on November 12, 2013, I electronically filed Chrysler's Motion to Dismiss with the Clerk of Court using the CM/ECF system that will send notification of such filing to all attorneys of record.

DATED: November 12, 2013

Respectfully submitted,

/s/   *Colin R. Kass*

Colin R. Kass, admitted *pro hac vice*
Scott M. Abeles, admitted *pro hac vice*
Sally M. Handmaker, SBN 281186
PROSKAUER ROSE LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2533
T: (202) 416-6800
F: (202) 416-6899