# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **MATHEW ENTERPRISE, INC.,** ) | 13-cv-04236-BLF-NMC |
| ) | |
| Plaintiff, ) | **[Proposed] Joint Pre-Trial Statement and Order** |
| ) | |
| ) | |
| v. ) | Trial Date:  September 12, 2016 |
| ) | Time:  9:00 a.m. |
| **FCA US LLC** ) | Courtroom:  3 |
| **f/k/a CHRYSLER GROUP LLC,** ) | Location:  280 S. 1st Street, 5th Floor |
| ) | San Jose, CA 95113 |
| Defendant. ) | Action Filed:  September 12, 2013 |
| ) | |

I.      **THE ACTION**

       *A.      The Parties*

The parties who have been served and have appeared are:

Plaintiff:  Mathew Enterprise, Inc. d/b/a Stevens Creek Chrysler Jeep Dodge Ram.   In this litigation, the plaintiff is usually referred to as "Stevens Creek."

Defendant:  FCA US LLC f/k/a Chrysler Group LLC.  In this litigation, the defendant is usually referred to as "Chrysler."

       *B.      Substance of the Action*

           1.      **Joint Statement of Stevens Creek's Claim**

The sole remaining claim in this action is Stevens Creek's claim for damages caused by Chrysler's alleged violation of Section 2(a) of the Clayton Act as amended by the Robinson-Patman Act (15 U.S.C. § 13(a)), which makes it unlawful for any seller engaged in commerce to directly or indirectly discriminate in the price charged purchasers on the sale of commodities of like grade and quality where the effect may be to injure, destroy or prevent competition with a favored purchaser.

The parties state jointly that to prevail under Section 2(a), a plaintiff must establish the following four elements: (1) the relevant sales were made in interstate commerce; (2) the products were of like grade and quality; (3) the seller discriminated in price between the plaintiff and another purchaser of the same products; and (4) that the effect of that price discrimination may be to injure, destroy, or prevent competition to the advantage of a favored purchaser.  *Volvo Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc. (Volvo)*, 546 U.S. 164, 176 (2006).

In addition, to recover damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, the plaintiff must show that the alleged unlawful conduct caused the plaintiff to suffer antitrust injury, which is the injury the Robinson-Patman Act was intended to prevent and that flows from the anticompetitive effects that make the conduct unlawful.  *Hasbrouck v. Texaco, Inc.*, 842 F.2d

1034, 1042 (9ᵗʰ Cir. 1987) *aff'd*, 496 U.S. 543 (1990) ("Plaintiffs must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.  The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation.  It should, in short, be 'the type of loss that the claimed violations ... would be likely to cause.'") (citing *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 125 (1969), *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489 (1977), and *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 562 (1981)).

2.    **Chrysler's Separate Statement Regarding Its Defenses**

Chrysler denies that it has violated Section 2(a) for a number of separate and independent reasons.

*First,* Chrysler denies that the incentives were "functionally unavailable" to Stevens Creek.  Chrysler contends that Section 2(a) does not impose an affirmative obligation to grant Stevens Creek a policy exception to its Volume Growth Program.  In particular, neither the application of its standard policies and practices to Stevens Creek, nor the application of a proxy for prior year's sales when calculating initial start-up objectives for Fremont, constitutes "unfair administration" of the program, thereby, precluding a finding of "functional unavailability." Chrysler further contends that Stevens Creek cannot establish functional unavailability because it has not shown that it was unable to earn the incentives using commercially reasonable efforts.

*Second*, Chrysler denies that there has been any actual or likely cognizable injury to competition.  Stevens Creek claims that, in August of 2012, it decided to raise its minimum negotiated price, causing prospective customers to leave Stevens Creek's dealership without a signed deal for a new car.  Chrysler denies that Stevens Creek's decision to change its negotiation strategy was due to Fremont's entry, Chrysler's Volume Growth Program, or Chrysler's decision not to grant Stevens Creek a policy exception to that program.  Instead,

1    Chrysler contends that Stevens Creek's change in negotiation strategy was due to other factors,

2    including changes in Stevens Creek's management, and was not economically rational.

3    Moreover, even if the change in Stevens Creek's negotiation strategy could be attributed to

4    Chrysler's decision not to grant Stevens Creek a policy exception, Stevens Creek has not shown

5    through direct or circumstantial evidence that its decision injured competition between Stevens

6    Creek and any so-called "favored dealer."  In that regard, Chrysler notes that Stevens Creek has

7    presented no admissible evidence of diversion between it and Fremont or any other unspecified

8    favored dealer.  Chrysler also notes that Chrysler's Volume Growth Program, and the manner in

9    which it is administered, promotes intrabrand competition, including competition between

10   Stevens Creek and surrounding dealers, and therefore, the decision not to grant Stevens Creek a

11   policy exception does not injure competition.

12        *Third*, Chrysler denies that Stevens Creek can show antitrust injury or damages.  Chrysler

13   notes that the Robinson-Patman Act does not permit recovery for sales that are lost due to price

14   discrimination, but only lost sales flowing from a diminishment in competition among goods of

15   like grade and quality between it and a favored dealer.   As such, actual evidence and

16   quantification of diversion of sales of like grade and quality between Stevens Creek and a

17   favored dealer is required in order to establish antitrust injury and damages.  Chrysler contends

18   that Stevens Creek has no admissible evidence of such diversion. In particular, Chrysler notes

19   that, following a failed negotiation, Stevens Creek's prospective customers had many choices,

20   including (i) not purchasing a vehicle, (ii) purchasing a used vehicle, (iii) purchasing a vehicle of

21   a different brand, such as a Ford, GM, Toyota, or Honda, (iv) purchasing a vehicle from a non-

22   favored dealer, or (v) purchasing a different model or vehicle (i.e., one that is not of like grand

23   and quality) from a favored dealer.  None of those choices constitute diversion of vehicles of like

24   grade and quality from Stevens Creek to a favored dealer, and therefore, Stevens Creek cannot

25   recover damages for sales lost in such circumstances.  In addition, Chrysler contends that, to the

26

27                                            4

28                              Joint Pretrial Statement
                                   13-cv-04236-BLF

extent Stevens Creek did lose sales to a favored dealer, the loss of such sales was not due to the alleged price discrimination, but was due to other factors, such as (i) Fremont's greater convenience for a significant portion of the relevant population, (ii) Fremont's superior modern facility, (iii) Fremont's user-friendly website and internet presence, (iv) Stevens Creek's poor customer service, (v) Stevens Creek's poor ratings on consumer rating services, such as Yelp, and (vi) Stevens Creek's changed management.  Chrysler also contends that Stevens Creek's change in negotiation strategy was partly designed to game Chrysler's VGP program, by resetting its objectives for future years at a lower level, while seeking to shift the costs of this strategy to Chrysler through this litigation.

*Fourth*, Chrysler contends that Stevens Creek could have avoided or mitigated its damages by maintaining its pre-entry negotiation strategy and not raising its minimum negotiation price.  Chrysler notes that Stevens Creek was under an affirmative duty to mitigate damages, and that Stevens Creek failed to do so.  Specifically, Chrysler contends that Stevens Creek could have avoided all injury had it acted in a commercially reasonable and economically rational manner, which would have required that it maintain its pre-entry negotiation strategy.

### 3.      Pleadings in which Each Claim and Defense is Presented

Stevens Creek's Section 2(a) claim was presented in its Amended Complaint for Violation of 15 U.S.C. 13 (ECF 51-4, Aug. 1, 2014).  Chrysler's defenses were presented in its Answer to Plaintiff's First Amended Complaint (ECF 57, Aug. 22, 2014).

### C.      *Relief Sought*

Pursuant to 15 U.S.C. § 15, Stevens Creek states that it is claiming three times the damages sustained by it by reason of Chrysler's alleged violation of 15 U.S.C. § 13(a), plus its cost of suit, including a reasonable attorney's fee.  The potential range of damages as set forth in Stevens Creek's expert reports is $338,040.00 to $1,827,526, before trebling.

**D.      Federal Jurisdiction and Venue**

The parties state jointly that this Court has subject matter jurisdiction over the claim pursuant to 28 U.S.C. § 1337(a), because Steven Creek's claim arises under an Act of Congress regulating commerce and protecting trade and commerce against restraints.  In addition, the court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a), in that the amount in controversy exceeds the sum or value of $75,000 and diversity of citizenship exists between Stevens Creek and Chrysler.

Venue is proper in this court pursuant to 28 U.S.C. §1391(b)(1), (2) and (3), and 28 U.S.C. § 1391(c), because Stevens Creek's principal place of business is located in this district, Chrysler is subject to personal jurisdiction in this district, and a substantial part of the events and omissions giving rise to Stevens Creek's claim have occurred in this district.

## II.      FACTUAL BASIS OF THE ACTION

**A.      Undisputed Facts**

The parties jointly state that the following facts are undisputed:

1.       The defendant, FCA US LLC, formerly Chrysler Group LLC ("Chrysler"), is a Delaware corporation with its principal place of business located at 1000 Chrysler Drive, Auburn Hills, Michigan 48326.

2.       Chrysler manufactures and sells motor vehicles under, among others, the Chrysler, Jeep, Dodge, and Ram ("CJDR") brands.

3.       Chrysler sells these vehicles in competition with other vehicle brands, including GM, Ford, Toyota, Honda, Nissan, BMW, Lexus, Audi, and Hyundai. Competition with other brands is referred to as "interbrand competition."

4.       Chrysler competes with other vehicle brands in terms of price and non-price factors.

5.       Chrysler distributes its CJDR vehicles through a nationwide network of franchised dealers, which purchase and resell CJDR vehicles.

6.       The plaintiff, Mathew Enterprise, Inc., doing business as Stevens Creek CJDR ("Stevens Creek"), is a California corporation with its principal place of business located at 4100 Stevens Creek Boulevard, San Jose, California 95129.

7.     Stevens Creek is a franchised dealer of CJDR vehicles.

8.     Stevens Creek became a Chrysler and Dodge dealer in December 2006 and a Jeep dealer in January 2007.

9.     In May 2012, Chrysler rebranded the Dodge truck as the Ram truck and on May 31, 2012, Stevens Creek became a Ram truck dealer.

10.    Stevens Creek is located in the San Jose Sales Locality, as defined by Chrysler.

11.    Since 2010, Normandin has been the only other CJDR dealer in the San Jose Sales Locality.

12.    When more than one CJDR dealer is located in a Sales Locality, Chrysler assigns each dealer a portion of the Sales Locality, which it refers to as a Trade Zone.

13.    Since 2010, there have been three trade zones in the San Jose Sales Locality.

14.    Stevens Creek is located in the Santa Clara Trade Zone, as defined by Chrysler.

15.    Normandin is located in the San Jose South Trade Zone, as defined by Chrysler.

16.    There is an "open point" in the Sunnyvale Trade Zone, which is the third Trade Zone in the San Jose Sales Locality.

17.    An "open point" is a Trade Zone that does not have a CJDR dealer and where Chrysler plans to establish one.

18.    The Oakland Sales Locality is adjacent to the San Jose Locality.

19.    In June of 2012, Chrysler established a new CJDR dealer ("Fremont") at a location in Newark, California in the Fremont Trade Zone.

20.    Prior to Fremont's establishment, there was no CJDR dealer in the Fremont Trade Zone, which abuts the Santa Clara Trade Zone and San Jose Sales Locality.

21.    Fremont is located approximately 14 miles from Stevens Creek, and is the second closest CJDR dealer to Stevens Creek, after Normandin.

22.    At all relevant times, the sales of CJDR vehicles that Chrysler made to Stevens Creek and Fremont crossed state lines.

23.    Chrysler has a variety of incentive programs, which provide discounts or rebates to dealers or consumers.

24.    Some of Chrysler's incentives programs provide discounts or rebates to the consumer.  These programs as are referred to as "Consumer Cash" programs.

Joint Pretrial Statement
13-cv-04236-BLF

25.    Some of Chrysler's incentives programs provide incentive monies directly to the dealer.  These programs are called "Dealer Cash" programs.

26.    Chrysler's Dealer Cash programs do not require that any portion of the incentive be passed on to the consumer and allow the dealer to use such incentives for any purpose.

27.    Chrysler's Volume Growth Program, or VGP, is a Dealer Cash Program.

28.    Chrysler's VGP changes from time to time, but it generally provides dealers with incentive payments if they meet certain sales objectives in a given month.

29.    At all times from July 2012 through June 2013, Stevens Creek's objectives were based on the standard formula that applied to all existing (non-new) dealers.

30.    After June 2013, objectives for all relevant dealers, including Fremont, were set using the same formula.

31.    Stevens Creek did not change its published or advertised price as a result of not receiving incentives between July 2012 and June 2013.

**B.     Facts Relating to Stevens Creeks' Failure to Preserve Emails and Evidence of Customer Communications or Negotiations.**

In the event that the Court determines that Stevens Creek has introduced testimony of a percipient witness about (a) why he or she believes customers were diverted to dealerships other than Stevens Creek, or (b) about negotiations, individually or in the aggregate, that took place during the alleged discrimination period at Stevens Creek relating to new CJDR vehicle sales, the parties agree to further state jointly the following:[1]

1.    The following statements are factual findings made by Judge Grewal, the judge to whom Judge Freeman referred discovery matters in this case.

2.     "Stevens Creek sent a litigation threat letter [to Chrysler] [o]n August 1, 2012."

3.    "But for almost a year afterwards—much of the period during which Chrysler allegedly violated the Robinson-Patman Act —Stevens Creek made no effort to preserve communications from customers or internal emails."

---

[1] Statements within quotation marks are from Magistrate Judge Grewal's May 23, 2016 Order, at ECF 225.

Joint Pretrial Statement
13-cv-04236-BLF

4.      "Instead, the outside vendor storing the customer communications deleted them automatically without complaint from Stevens Creek."

5.      Specifically, the outside vendor, AVV, deleted "'all prospect notes'—including 'all records of communication; inbound/outbound email, read receipt notifications and manually entered notes by a dealership representative'—automatically after 25 months."

6.      "Because Stevens Creek did not reach out to AVV until July 2015, effectively all customer communications from the period at issue" – July of 2012 through June of 2013 – "were lost irretrievably."

7.      "Stevens Creek discarded all its old messages while switching email providers."

8.      "There is no question that spoliation" – the destruction of relevant evidence – "has occurred."

9.      Stevens Creek did make efforts to retrieve the lost information once brought to its attention, and did not deliberately destroy the evidence.

10.     "[D]espite Stevens Creek's belated best efforts, these communications are lost forever."

## C.   *Disputed Facts*

The parties state jointly that the following facts are disputed:

1.      Whether Chrysler administered its Volume Growth Program (VGP), in an even-handed manner during the period July 2012-June 2013.

2.      Whether Stevens Creek could have achieved its objectives, in any, some, or all months during the period July 2012-June 2013 by using reasonable commercial efforts.

3.      Whether and in what circumstances Stevens Creek competed on negotiated price with Fremont, San Leandro, Normandin, Putnam and Stoneridge for sales of new CJDR vehicles in the same geographic areas.

4.      Whether more than a *de minimis* number of vehicles, if any, were diverted from Stevens Creek to a favored dealer because of price during the period July 2012-June 2013.

5.      Whether such diverted sales, if any, concerned vehicles of like grade and quality.

6.      Whether such diverted sales, if any, concerned vehicles sold contemporaneously.

7.      Whether the alleged price discrimination was "substantial."

8.      Whether the alleged price discrimination was "sustained."

9.      Whether the alleged discrimination was substantial and sustained enough to likely cause diversion.

10.     Whether Stevens Creek lost profits on diverted sales, if any, and the amount of the loss thereof.

## III.   DISPUTED LEGAL ISSUES

The Parties state jointly that the following legal issues are disputed:

1.      **Disputed Legal Issues Concerning the Admissibility of Plaintiffs' Expert, Edward M. Stockton**

1.   *Should the testimony of Edward M. Stockton be excluded in whole or in part for the reasons explained in Chrysler's Motion to Exclude (ECF 178)?*

A.    <u>Chrysler's position:</u>  Yes. Stockton's proposed testimony should be excluded for each of the 22 reasons set for it Chrysler's motion.  Given the complexity of these issues, Chrysler respectfully requests either pre-trial argument or a pre-trial *Daubert* hearing on these issues.

B.    <u>Stevens Creek's position</u>: No. Stevens Creek's positions are set forth in Plaintiff's Response to Chrysler's Revised *Daubert* Motion (ECF 195) and Plaintiff's Response to Chrysler's Revised Motion to Strike New Work Preferred By Edward M. Stockton (ECF 196).

2.      **Disputed Legal Issues Concerning the Scope of the "to Discriminate in Price" Element of the Claim.**

2.   *Is Section 2(a) of the Robinson-Patman Act limited to "price discrimination" or does it extend to "objective discrimination"?*

A.    <u>Chrysler's position:</u>  Section 2(a) of the RPA is limited to price discrimination; it does not condemn "objective discrimination."  15 U.S.C § 13(a) ("It shall be unlawful for any person … to discriminate in ***price*** between different purchasers of commodities of like grade and quality …").

B.    <u>Stevens Creek's position</u>: Stevens Creek understands Chrysler's use of the term "objective discrimination" to mean price discrimination resulting from the seller's discriminatory administration of an incentive program.  An incentive program is not functionally available if it is not administered in an even-handed manner. *Smith Wholesale Co. v. R.J. Reynolds Tobacco Co.*, 477 F.3d 854, 872 (6th Cir. 2007); *Metro Ford Truck Sales v. Ford Motor Co.,* 145 F.3d 320 (5th Cir. 1998)

10

*Bouldis v. U.S. Suzuki Motor Corp.*, 711 F.2d 1319, 1326 (6th Cir. 1983); *FLM Collision Parts, Inc. v. Ford Motor Co.*, 543 F.2d 1019, 1024 (2d Cir. 1976).

3.   **Disputed Legal Issues Relating to Functional Availability**

3.   *Does the plaintiff bear the burden of proving that the defendant's incentives were functionally unavailable to the plaintiff or is the functional availability of the incentives an affirmative defense which the defendant bears the burden of proving?*

A.   <u>Chrysler's position</u>: Yes.  *See Smith Wholesale Co., Inc. v. R.J. Reynolds Tobacco Co.*, 477 F.3d 854, 867 (6th Cir. 2007) (rejecting argument that the burden of proving functional availability is on the defendant and concluding that that "functional availability is technically *not* an affirmative defense, but the negation of an element of the plaintiff's case."); *cf. Texaco Inc. v. Hasbrouck*, 496 U.S. 543, 561 n.18 (1990) (though addressing "functional discounts" rather than "functionally available discounts," placing the burden on plaintiff to prove discount not available, "since functional pricing negates the probability of competitive injury, an element of a prima facie case of violation").

B.   <u>Stevens Creek's position</u>: Stevens Creek is aware of no controlling authority in the Ninth Circuit for whether functional availability is an affirmative defense or an element of the plaintiff's prima facie case.  Several courts in other jurisdictions have referred to functional availability as a "defense." *DeLong Equip. Co. v. Washington Mills Abrasive Co.,* 887 F.2d 1499, 1516 (11th Cir.1989); *Allied Sales and Serv. Co.,* 2000 WL 726216 at *17 (S.D. Ala. May 1, 2000); *Calumet Breweries, Inc. v. G. Heileman Brewing Co.,* 951 F.Supp. 749, 753–55 (N.D.Ind.1994); *Cain v. Chevron U.S.A., Inc.,* 757 F.Supp. 1120, 1123 (D.Ore.1991).  Even if "technically not an affirmative defense", functional availability is "the negation of an element of the plaintiff's case", which requires "evidence showing that a pricing or discount scheme is functionally available to all participants on an equal basis, . . .." *Smith Wholesale Co.*, 477 F.3d at 867.  Accordingly, Chrysler has the burden of producing evidence to show that the VGP incentives were functionally available to Stevens Creek during the price discrimination period.

4.   *Must the plaintiff prove that the defendant's incentive program was "unfairly administered" in cases in which the plaintiff participates in the program but does not qualify for a particular incentive?*

A.   <u>Chrysler's position</u>: Yes. *See* ECF 45 at 7 (quoting *Smith,* 477 F.3d at 866  (a "[m]anufacturer may utilize promotional arrangements and provide financial incentives to favor its product . . . [which] will lead to different outcomes for different purchasers")); *FLM Collision Parts, Inc. v. Ford Motor Co.*, 543 F.2d 1019, 1024-25 (2nd Cir. 1976) (even though it may not "set a single uniform price for all types of sales," an incentive program does not violate the Act if

"administered with an even hand, without any discrimination among the dealers"); *L. S. Amster & Co., Inc. v. McNeil Labs., Inc.*, 504 F. Supp. 617, 625 (S.D.N.Y. 1980) (the "cases establish that the … program need not guarantee that all customers benefit to the same degree as other customers, as long as the program is evenly administered").

B.   <u>Stevens Creek's position</u>: No. Incentives are functionally available only where they are both "equally and realistically available to all purchasers." *Smith Wholesale Co.*, 477 F.3d at 872.   A discount or incentive program is not functionally available if, even though the favorable pricing is, on its face, made available to all on equal terms, the capacity of the plaintiff to take advantage of it is not determined by elements within its control. *Id.* Where purchase or sales requirements needed to obtain the most favorable pricing exceed the purchases or sales that the disfavored competitor can reasonably be expected to make, that pricing is not functionally available regardless of the fairness by which the program is administered. *FTC v. Morton Salt Co.*, 334 U.S. 37, 42-43 (1948).

5.   *In cases claiming unfair administration of an incentive program, where the program otherwise promotes inter-brand and intra-brand competition, must the plaintiff prove that the defendant lacked a reasonable basis for establishing the criteria used in determining whether a dealer qualifies for an incentive?*

A.   <u>Chrysler's position</u>:  Yes.  Where a defendant has a legitimate, pro-competitive rationale for establishing the criteria used for determining when incentives are earned, a program will not injure competition just because different program may be more procompetitive. *See O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 802 F.3d 1049, 1075 (9th Cir. 2015) ("courts should not use antitrust law to make marginal adjustments to broadly reasonable market restraints") (citing *Bruce Drug, Inc. v. Hollister, Inc.*, 688 F.2d 853, 860 (1st Cir.1982) (defendants are "***not required to adopt the least restrictive***" alternative) (emphasis added); *American Motor Inns, Inc. v. Holiday Inns, Inc.*, 521 F.2d 1230, 1249 (3rd Cir. 1975) (The antitrust laws do not convert "entrepreneurs" into "guarantors that the imaginations of lawyers could not conjure up some method of achieving the business purpose in question that would result in a somewhat lesser restriction of trade."); *Bouldis v. U.S. Suzuki Motor Corp.*, 711 F.2d 1319, 1326 (6th Cir. 1983) (no Section 2(a) violation when program criteria based on "legitimate business factors" and/or "upon valid business considerations").

B.    <u>Stevens Creek's position</u>: No.  There is no authority for applying a different "functional availability" standard based on whether the program promotes inter-brand or intra-brand competition.  An incentive program can be found unfairly administered where objectives are determined differently for competing dealers in a way that makes the favored dealer's objectives more easily achievable. *Smith Wholesale Co.*, 477 F.3d at 872 (functional availability exists when "the best discount [is] made 'available on a reasonably equivalent basis to all dealers . . . .)

6. *Regardless of whether a program was fairly administered, to establish functional unavailability, must a plaintiff prove that it could not have earned the incentive using commercially reasonable efforts?*

   A. <u>Chrysler's position:</u>  Yes.  *Southwest Paper Co., LLC v. Hansol Paper*, 2013 WL 11238487, at *4 (C.D. Cal. 2013) (a functionally available discount is one that bears a "commercially reasonable" relationship between the discount and "costs incurred by the buyer" to achieve it); *Smith*, 477 F.3d at 873 n.12 ("a discount program may be functionally available even when the choice 'would have threatened [the plaintiff's] very existence'");  *American Tara Corp. v. International Paper Co.*, 1981 WL 375752, at *3 (N.D. Ill. 1981) (discounts were functionally available where plaintiffs elected, "based on their business judgment, to suffer competitive injury if their competitors purchased at the lower price rather than assume the disabilities or risks in the commitment necessary to purchase at the lower price").

   B. <u>Stevens Creek's position</u>: No.  An incentive program is functionally available only if it is fairly administered *and* the objectives are practically attainable by the plaintiff based on elements within its control.  *Smith Wholesale Co.*, 477 F.3d at 872.

   4. **Disputed Legal Issues Relating to the "Competitive Nexus" Requirement**

7. *To establish that price discrimination may tend to substantially injure competition, must a plaintiff show both (i) a competitive nexus between the plaintiff and a favored dealer, and (ii) that the price discrimination is likely to injure such competition?*

   A. <u>Chrysler's position:</u> Yes.  *See, e.g., Stelwagon Mfg. Co. v. Tarmac Roofing Sys.*, 63 F.3d 1267, 1271-72 (3rd Cir. 1995) (to satisfy "competitive injury" requirement, plaintiff must "***first*** prove that, as the disfavored purchaser, it was engaged in actual competition with the favored purchaser(s) as of the time of the price differential," known as the "'competitive nexus' requirement. … ***Once*** the existence of a competitive relationship has been established, '[i]njury to competition is usually shown in either of two ways,'" through diversion or *Morton Salt*) (emphasis added).

   B. <u>Stevens Creek's position:</u> Yes.  Competitive injury is proven if: (1) the favored and disfavored purchasers compete at the same functional level and within the same geographic market, *Stelwagon Mfg. Co. v. Tarmac Roofing Sys, Inc.,* 63 F.3d 1267, 1271 (3d Cir. 1995); and (2) there is either (a) direct evidence of lost sales or profits caused by the price discrimination; or (b) a substantial difference in price between sales to the favored and disfavored competitors over a significant period of time. *Falls City Indus. Inc. v. Vanco Beverage, Inc.*, 460 U.S. 428, 435 (1983).

13

8. *To establish the requisite competitive nexus, must a plaintiff define a relevant product and geographic market?*

    A.   <u>Chrysler's position:</u> Yes. *See, e.g., Am. Booksellers Ass'n, Inc. v. Barnes & Noble, Inc.*, 135 F. Supp. 2d 1031, 1040-41 (N.D. Cal. 2001) (summary judgment granted to defendants where, *inter alia*, expert's model "artificially limits the relevant market in which plaintiffs and defendants compete"); *Water Craft Mgmt., L.L.C. v. Mercury Marine*, 361 F. Supp. 2d 518, 541 (M.D. La. 2004) ("Plaintiffs also failed to prove a prima facie Robinson–Patman claim because they failed to offer testimony or other evidence that adequately defined the relevant geographic and product markets…. It is well settled that the relevant product and geographic markets must be defined with some degree of precision to enable the trier of fact to determine if federal antitrust laws have been violated."); *see also* ABA SECTION OF ANTITRUST LAW, *Antitrust Law Developments*, at 570 (7th ed. 2012) ("Determining whether discriminatory prices have … adverse competitive effects ordinarily requires a definition of the relevant market.") (citing cases).

    B.   <u>Stevens Creek's position:</u> No. The "requisite competitive nexus" does not require definition of a relevant product or geographic market in the traditional antitrust sense because the existence or potential existence of market or monopoly power is not an issue in a secondary line Robinson-Patman Act case. That is, the outer boundaries of the relevant geographic market are not important as long as the evidence shows that the favored and disfavored competitors compete for sales within the same geographic area. To the extent a relevant market definition is required, the relevant product market here is obviously passenger cars and light trucks of the type sold by Chrysler to CJDR dealers, and the relevant geographic market consists of the area within which Stevens Creek sells new CJDR vehicles and includes the other CJDR dealers to which the vehicle purchasers in that area can practicably turn to buy new CJDR vehicles. *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 359 (1963); *Tampa Elec. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961); *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995).

9. *Must a relevant geographic market be limited to those dealers for which there is significant <u>price</u> competition with the plaintiff for the applicable sales?*

    A.   <u>Chrysler's position:</u> Yes. A relevant antitrust market requires that there be a reasonably high cross-elasticity of demand of substitution based on price, particularly in cases in which the relevant question is whether price discrimination has adversely affected competition. *See Times-Picayune Pbl'g Co. v. United States*, 345 U.S. 594, 612 n. 31 (1953) ("a relevant market cannot meaningfully encompass [an] infinite range. The circle must be drawn **narrowly** to exclude any other product to which, within reasonable variations in **price**, only a limited number of buyers will turn; in technical terms, products whose '**cross elasticities** … **are small**'" should be excluded) (emphasis added); *United States v. E.I.*

*DuPont de Nemours & Co.*, 351 U.S. 377 377, 397-404 (1956); *FTC and DOJ Horizontal Merger Guidelines* (2014) (defining markets with reference to the hypothetical monopolist test, which defines the market as the smallest one to which a hypothetical monopolist of the products could raise prices by a small, but significant, and non-transitory amount).

B.   <u>Stevens Creek's position:</u> No.   A relevant geographic market area includes all dealers to which vehicle purchasers in a given geographic area "can practically turn" to purchase a vehicle.  *Philadelphia Nat'l Bank*, 374 U.S. at 359.  There are various means of determining a relevant geographic market.  Actual sales patterns often are used to determine whether two areas are within the same geographic market. *Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 230-31 (2d Cir. 2006); *Tampa Electric*, 365 U.S. at 331-33.   The boundaries of a relevant geographic market extend at least to the point where customers within an area buy products.  *Little Rock Cardiology Clinic v. Baptist Health*, 591 F.3d 591, 598-601 (8th Cir. 2009) cert. denied, 130 S.Ct. 3506 (2009).

10.   *In claims that involve allegations that the alleged price discrimination adversely affected the plaintiff's negotiations with customers, is the relevant market limited to the specific dealers that were negotiating over the same sale?*

A.   <u>Chrysler's position:</u> Yes.  *Volvo*, 546 U.S. at 167 ("[o]nce the customer has chosen the particular dealers from which it will solicit bids, the relevant market becomes limited to the needs and demands of the particular end user"); *see also id.*, at 173-74 (the fact that "dealers may bid for sales in the same geographic area does not import that they in fact competed for the same" sales); *id.* at 177 ("discrimination" must substantially inhibit rivalry "for the same customer"); *Feesers, Inc. v. Michael Foods, Inc.*, 591 F.3d 191, 197 (3rd Cir. 2010) (parties must be "each directly after the same dollar. … We refer to this dollar-for-dollar analysis as the competing purchaser requirement.").

B.   <u>Stevens Creek's position:</u> No. In markets where the price discrimination occurs before customers limit the competitors they will consider, the relevant geographic market consists of all competitors that the customers can turn to buy the relevant product. *Philadelphia Nat'l Bank*, 374 U.S. at 359 (1963); *Tampa Elec.,* 365 U.S. at 327; *Rebel Oil Co.*, 51 F.3d at 1434.

5.   **Disputed Legal Issues Relating to the Injury to Competition Requirement**

11.   *Where a plaintiff's claim of injury rests on failed negotiations, does the competitive injury element of the claim require the plaintiff to prove either (i) actual diversion, or (ii) a discrimination in price substantial and sustained enough to likely cause diversion?*

A.   <u>Chrysler's position:</u> Yes. "Diversion" is the "hallmark of the requisite competitive injury" in a price discrimination case. *Volvo*, 546 U.S. at 177.  Thus, "direct

evidence of displaced sales" establishes competitive injury. *Hasbrouck*, 842 F.2d at 1041. In the absence of evidence of actual diversion, a plaintiff may satisfy the competitive injury requirement through the *Morton Salt* presumption, which requires proof of a substantial and sustained discrimination in price. But regardless of the method of proof, "a plaintiff must demonstrate that the likely effect of the alleged price discrimination was to allow a favored competitor to draw significant sales or profits away from him." *See Chrysler Credit Corp. v. J. Truett Payne Co.*, 670 F.2d 575, 580 (5th Cir. 1982) (regardless of the *type* of evidence offered,); *Drug Mart Pharmacy Corp. v. Am. Home Products, Corp. (Drug Mart II)*, 2012 WL 3544771, at \*9 (E.D.N.Y. 2012) ("it is difficult to conceive of" competitive harm without "significant diversion").

B.   <u>Stevens Creek's position:</u>   Yes.   Competitive injury may be shown by either actual diversion or by a substantial price difference over a significant time period. *Falls City Indus. Inc.,* 460 U.S. at 435.

12.   *In seeking to prove competitive injury through direct evidence, must a plaintiff isolate the sales that it lost to favored dealers due to price discrimination from sales that the plaintiff lost for other reasons?*

A.   <u>Chrysler's position:</u> Yes.   *See Madani v. Equilon Enters. LLC*, 2009 WL 2148664, \*12 (C.D. Cal. 2009) (where plaintiff's expert "did not … identify customer transfers between stations or examine movement of specific customers" and "admitted that he does not know where plaintiffs' claimed lost volumes go," competitive injury showing necessarily failed); *Drug Mart Pharmacy Corp. v. Am. Home Products Corp.*, 472 F. Supp. 2d 385, 429 (E.D.N.Y. 2007) (*Drug Mart I*) ("sales shift analysis" failed because it did not isolate how many customers the disfavored purchasers "lost … to any specific favored purchaser"); *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1428, 1433 (2013) (noting "unremarkable premise" that since plaintiffs "are entitled only to damages resulting from" the challenged conduct, a "model purporting to serve as evidence of damages … must measure only those damages attributable" to that conduct); *Litton Sys., Inc. v. Honeywell, Inc.*, 1996 WL 634213, at \*2 (C.D. Cal. 1996) (requiring disaggregation).

B.   <u>Stevens Creek's position:</u>   No.   Competitive injury based on actual diversion can be shown by evidence of the plaintiff's losing sales or market share and the favored competitors gaining sales or market share contemporaneous with the price discrimination. *Alan's of Atlanta, Inc. v. Minolta Corp.*, 903 F.2d 1414, 1427-28 (11th Cir. 1990); *Hasbrouck v. Texaco, Inc.,* 842 F.2d 1034, 1042-43 (9th Cir. 1987), *aff'd*, 496 U.S. 543 (1990); *Falls City Indus. Inc. v. Vanco Beverage Inc.,* 460 U.S. 428, 433 n.4, 437 n.8 (1983). The defendant may introduce evidence of other factors that may have contributed to the plaintiff's lost sales and the favored competitor's sales increases; however, if some of the plaintiff's lost sales are

found due to the price discrimination, the defendant is responsible to that extent. *Falls City Indus. Inc.* at 437.

13. *In order to prove competitive injury through direct evidence of diversion, must a plaintiff prove more than that it competes with a favored dealer in the same geographic market (i.e., that there is a competitive nexus)?*

   A. <u>Chrysler's position</u>:  Yes.  Proof that a favored dealer competes with a disfavored dealer is relevant to whether there is a sufficient "competitive nexus," but it is not evidence actual evidence of diversion.  The competitive nexus inquiry is just the "first step" in the harm to competition inquiry. *See Stelwagon*, 63 F.3d at 1271-72.  The next step requires either proof of either actual diversion or of a substantial and sustained discrimination in price likely to cause diversion.  *See supra.*

   B. <u>Stevens Creek's position</u>:  Yes.  However, competitive injury based on actual diversion may be shown by evidence of the plaintiff's losing sales or market share and the favored competitors gaining sales or market share contemporaneous with the price discrimination. *Alan's of Atlanta, Inc. v. Minolta Corp.*, 903 F.2d 1414, 1427-28 (11th Cir. 1990); *Hasbrouck v. Texaco, Inc.*, 842 F.2d 1034, 1042-43 (9th Cir. 1987), *aff'd*, 496 U.S. 543 (1990); *Falls City Indus. Inc. v. Vanco Beverage Inc.,* 460 U.S. 428, 433 n.4, 437 n.8 (1983).

14. *Is testimony from an owner or employee of a dealer concerning what prospective customers may have done following a failed negotiation inadmissible to prove diversion?*

   A. <u>Chrysler's position</u>:  Yes.  Lay testimony must be based on personal knowledge.  Fed. R. Evid. 602.  Testimony from an owner or employee based on his "experience" or on what others may have told him does not suffice.  *See Stelwagon*, 63 F.3d at 1275 (reversing denial of summary judgment because "anecdotal testimony of [plaintiff's] employees" about lost sales should not have been admitted); *Reserve Supply Corp. v. Owens-Corning Fiberglas Corp.*, 639 F. Supp. 1457, 1463 (N.D. Ill. 1986) (summary judgment granted where only direct evidence of diversion was "[t]he deposition testimony of Reserve official R.G. Hamrick, relating conversations in which former Reserve customers told him they had begun purchasing insulation from lower-priced distributors," which was "inadmissible hearsay"); *Mays v. Massey-Ferguson, Inc.*, 1990 WL 80673, at *5 (S.D. Ga. 1990) (rejecting affidavits of employees "based upon their experience in the sale of agricultural equipment" rather than knowledge of "why these particular [allegedly diverted] customers purchased equipment where they did.").

   B. <u>Stevens Creek's position</u>:  No.  Sales people are allowed to testify concerning transactions with customers where they lost sales to a favored competitor because of their inability to match their competitor's prices.  *J.F. Feeser v. Serv-A-Portion,* 909 F.2d 1524, 1535-36 (3d Cir. 1990) cert. denied, 111 S. Ct. 1313

(1991).  *See also, Rose Confections, Inc. v. Ambrosia Chocolate Co.,* 816 F.2d 381, 385 (8th Cir. 1987) (plaintiff's company president allowed to testify that his company had to reduce its prices in response to low price offers made by its competitors); *Zoslow v. MCA Distributing Corp.*, 594 F. Supp. 1022, 1035 (N.D. Cal. 1984) (plaintiff's statements that customers told him his prices were too high and they could buy the product at a lower price from a favored competitor were admissible to prove that customers were aware of the favored competitor and wished to bring it to the plaintiff's attention, from which a jury could infer competition.)

15.   *Where a plaintiff seeks to establish diversion through statistical evidence, must the plaintiff present such evidence through an expert whose opinions satisfy the standards of Fed. R. Civ. P. 702?*

A.   <u>Chrysler's position</u>:  Yes.  *Am. Booksellers Ass'n*, 135 F. Supp. 2d at 1042 ("only expert testimony can demonstrate that any injury to plaintiffs was caused by defendants' unlawful conduct and not because of lawful competition or other factors."); *The Intimate Bookshop, Inc. v. Barnes & Noble, Inc.*, 2003 WL 22251312, at *4 (S.D.N.Y. 2003) (same) (quoting *Am. Booksellers*); *Lott v. Westinghouse Savannah River Co.*, 200 F.R.D. 539, 546 (D.S.C. 2000) ("The general rule is that statistical evidence must be supported by expert testimony.") (citing *Carter v. Ball*, 33 F.3d 450, 456 (4th Cir.1994).

B.   <u>Stevens Creek's position</u>:  No.  Expert testimony is not required to establish competitive injury in Section 2(a) cases.  *Video Service of America, Inc. v. Maxell Corp. of America*, 2007 WL 2156359 (D.N.J. 2007) at *5.  For example, non-expert evidence of diverted sales based on a decline in the plaintiff's sales and a rise in the favored competitor's sales coincident with the introduction of the price discrimination may be used to show both competitive and antitrust injury.  *Alan's of Atlanta, Inc. v. Minolta Corp.*, 903 F.2d 1414, 1427-28 (11th Cir. 1990); *Hasbrouck v. Texaco, Inc.*, 842 F.2d 1034, 1042-43 (9th Cir. 1987), *aff'd*, 496 U.S. 543 (1990); *Falls City Indus. Inc. v. Vanco Beverage, Inc.,* 460 U.S. 428, 433 n.4, 437 n.8 (1983).

16.   *In seeking to prove competitive injury through the Morton Salt presumption, must a plaintiff show that the amount of the price discrimination was substantial and sustained enough to likely cause a significant number of prospective customers to choose a favored dealer over a disfavored dealer for vehicles of like grade and quality?*

A.   <u>Chrysler's position</u>: Yes.  The *Morton Salt* test may be satisfied only through proof that the "price discrimination" was "of such magnitude as to affect substantially competition between" the "favored" and "disfavored" dealers. *Volvo*, 546 U.S. at 180. Thus, regardless of the *type* of evidence offered to make this showing – whether direct or circumstantial – "a plaintiff must demonstrate that the likely effect of the alleged price discrimination was to allow a favored

competitor to draw significant sales or profits away from him." *See J. Truett Payne*, 670 F.2d at 580.

B.   Stevens Creek's position:  No. An inference of competitive injury arises from evidence that a favored competitor received a significant price reduction over time.  *Volvo Trucks North America Inc. v. Reeder-Simco GMC, Inc.*, 546 U.S. 164, 177-79 (2006).

17.   *In seeking to prove competitive injury through the Morton Salt presumption, must a plaintiff prove that the classes of favored and disfavored purchasers are discreet and non-transitory?*

A.   Chrysler's position:  Yes.  *See Volvo*, 546 U.S. at 178 ("declin[ing] to permit an inference of competitive injury" where there was no "discrete favored dealer comparable to a chainstore" that was "consistently favored."); *Int'l Film Ctr., Inc. v. Graflex, Inc.*, 427 F.2d 334, 336 (3rd Cir. 1970) (requiring the type of discount at issue in *Morton Salt*: "a built-in, routine and permanent price advantage" to make out showing); *Am. Oil Co. v. F.T.C.*, 325 F.2d 101, 106 (7th Cir. 1963) (*Morton Salt* requires "systematic," not "temporary," price discrimination); *Volvo*, 546 U.S. at 178 (members of the favored and disfavored classes be "discrete," not transitory); *see also* ECF 45 at 9 ("Plaintiff is alleging that Chrysler has set up its newly opened dealers as a class of 'favored purchasers,' … while at the same time imposing more onerous sales objectives on its pre-existing dealerships, thus creating a class of 'disfavored purchasers.'").

B.   Stevens Creek's position:  No.  Competitive injury can be shown by evidence that the price discrimination was likely to have caused injury to the plaintiff's ability to compete with one or more of its competitors which received the benefit of the price discrimination while it was in effect.  *Chroma Lighting v. GTE Prods. Corp.*, 111 F.3d 653, 657 (9th Cir. 1997); *see also Hasbrouck v. Texaco, Inc*., 842 F.2d 1034, 1040 (9th Cir. 1987).

18.   *Can the presumption of competitive injury arising from a substantial and sustained discrimination in price be rebutted by evidence that the plaintiffs' lost sales were attributable to factors other than price diversion to a favored dealer?*

A.   Chrysler's position:  Yes.  *See Falls City Indus., Inc. v. Vanco Beverage, Inc.*, 460 U.S. 428, 435 (1983) ("[i]n the absence of direct evidence of displaced sales," the *Morton Salt* inference "may be overcome by evidence breaking the causal connection between a price differential and lost sales or profits"); *Cash & Henderson Drugs, Inc. v. Johnson & Johnson*, 799 F.3d 202, 213-14 (2nd Cir. 2015) (presumption rebutted; lack of diversion evidence is "a powerful indication that price discrimination did not harm competition" under ***either*** evidentiary standard); *Drug Mart II*, 2012 WL 3544771, at *9 ("it is difficult to conceive of" competitive harm without "significant diversion"); *Walker v. Hallmark Cards,*

*Inc.,* 992 F. Supp. 1335, 1339-40 (M.D. Fla.1997) (requiring showing that "but for" defendant's discriminatory pricing, plaintiff's alleged injury would not have occurred, and suggested that favored customer's reputation for low prices may have caused plaintiff's loss of business without regard to alleged benefits from defendant-supplier).

B.  Stevens Creek's position:  Yes.  The *Morton Salt* inference of competitive injury may be rebutted "by evidence breaking the causal connection between a price differential and lost sales or profits."  *Falls City Indus. Inc.,* 460 U.S. at 435. Nevertheless, if any of the plaintiff's injury is attributable to the price discrimination, the defendant is responsible to that extent.  *Id.* at 437.

19.  *Can sales diversion caused by the price discrimination be shown by evidence of a lowering of the retail prices of the favored dealer in relation to the prices of the disfavored dealer and the contemporaneous increase in the favored dealer's sales and decrease in the disfavored dealer's sales?*

A.  Chrysler's position: **No.**  This question, posed by Stevens Creek, is an evidentiary question that concerns the admissibility and sufficiency of a proposed comparison among dealers.  But it is clear that a comparison of dealers' relative sales performance over two periods of time is not direct evidence of diversion.  Such an analysis does not speak to what specific customers did; nor is it proof that there was in fact any diversion.  Since it is not direct evidence of diversion, the next question is whether it constitutes admissible (and sufficient) indirect or circumstantial evidence of diversion.  But because there are many reasons why one dealer's sales can increase, while another's decreases, expert testimony is required to ensure that the comparison Stevens Creek wishes to make is reliable.  *Am. Booksellers Ass'n,* 135 F. Supp. 2d at 1042; *The Intimate Bookshop,* 2003 WL 22251312, at *4; *see also Lott v. Westinghouse Savannah River Co.,* 200 F.R.D. 539, 546 (D.S.C. 2000) ("The general rule is that statistical evidence must be supported by expert testimony.")  Here, for example, one dealer's sales could increase, while another's could decrease due to price sensitivity, changes in pricing strategies unrelated to incentives, or non-price factors.  Without an analysis that appropriately controls for these factors, the evidence cannot logically support the claim that there were diverted sales.  *Madani v. Equilon Enters. LLC,* 2009 WL 2148664, *11 (C.D. Cal. 2009) ("[F]ailure to account for other variables that may have affected plaintiffs' and their competitors' volumes renders [the] lost-sales analysis unreliable."); *see also, e.g., Litton Sys., Inc. v. Honeywell, Inc.,* 1996 WL 634213, at *2 (C.D. Cal. 1996) (requiring disaggregation); *El Aguila Food Prods. v. Gruma Corp.,* 301 F. Supp. 2d 612, 625-626 (S.D. Tex. 2003) (a model that "assumes that all of the plaintiff's los[t] sales are a result of an antitrust injury … is unreliable").  As Stevens Creek's own expert admitted, "logically, you cannot infer that there was diversion just because one dealer performs better than its market opportunity and another dealer performs worse than its market opportunity as a result of the alleged incentive

discrimination."  S1 Tr. 550.  Thus, to be admissible, the analysis must both (i) isolate the effects on each dealer's sales that is due to the alleged price discrimination, and (ii) isolate the changes in sales that were diverted, as opposed to lost due to mere price sensitivity.  This requires expert testimony that satisfies Rule 702.  Because a mere comparison of dealers' sales over time does not do this, it is neither admissible to show diversion, nor sufficient to support a jury verdict on that issue.

B.     <u>Stevens Creek's position</u>:  Yes.  Competitive injury based on actual diversion can be shown by evidence of the plaintiff's losing sales or market share and the favored competitors gaining sales or market share contemporaneous with the price discrimination.  *Alan's of Atlanta, Inc. v. Minolta Corp.*, 903 F.2d 1414, 1427-28 (11th Cir. 1990); *Hasbrouck v. Texaco, Inc.,* 842 F.2d 1034, 1042-43 (9th Cir. 1987), *aff'd*, 496 U.S. 543 (1990); *Falls City Indus. Inc. v. Vanco Beverage,* 460 U.S. 428, 433 n.4, 437 n.8 (1983).  As this Court indicated in denying Chrysler's original motion to dismiss Stevens Creek's Section 2(a) claim based on the VGP incentives, the allegations that "without the benefit of the subsidies [Stevens Creek's] monthly sales declined, while [the favored competitor's] sales increased during the same period when it reaped the benefits of the incentive program" were sufficient to make Stevens Creek's allegation of diverted sales "plausible."  Order Granting in Part and Denying in Part Defendant's Motions to Dismiss at 10-11 (ECF 45).

### 6.     Disputed Legal Issues Related to Antitrust Injury and Damages

20.     *Does the antitrust injury element of a Section 2(a) claim require that a plaintiff prove more than that it suffered lost sales as a result the alleged price discrimination?*

A.     <u>Chrysler's position</u>:  Yes.  *See* ECF 45 at 6 ("Reading the Act in its historical context, the Supreme Court has held that it bars 'price discrimination only to the extent that it threatens to injure competition.'") (quoting *Volvo*, 546 U.S. 164, 181 ("[W]e continue to construe the Act consistently with broader policies of the antitrust laws."); *Volvo*, at 180-81 ("we would resist interpretation geared more to the protection of existing competitors than to the stimulation of competition"); *Drug Mart I*, 472 F. Supp. 2d at 425-26 ("The *Morton Salt* test does not substitute 'injury to a competitor' for 'injury to competition,' but simply highlights one manner of showing injury to competition.").

B.     <u>Stevens Creek's position</u>:  No.  A plaintiff may show antitrust injury arising from a Section 2(a) violation by evidence either of sales lost to a favored competitor because plaintiff did not lower its price to match the favored competitor's price *or* of profits lost because it did lower its price to match the favored competitor's price. *J. Truett Payne Co. v. Chrysler Motor Corp.*, 451 U.S. 557, 564 n. 4 (1981).  However, in this case, Stevens Creek's injury is based on sales lost by not matching the favored competitors' incentive-subsidized prices.

21. *Where a plaintiff has limited its injury to lost sales through failed negotiations, must a plaintiff show actual diversion in order to establish "antitrust injury" for purposes of a damages claim under Section 4 of the Clayton Act?*

    A.    <u>Chrysler's position</u>:  Yes.  Antitrust injury in an RPA case consists of either (i) lost profits on sales diverted to a favored customer; and/or (ii) lost profits caused by the plaintiff being "forced" to reduce prices due to the unfair pricing advantage a favored dealer received. *J. Truett Payne Co.*, 451 U.S. at 564-65 & n.4; *Hasbrouck*, 842 F.2d at 1042.  The first type of injury arises from *failed* negotiations, while the second arises from *successful* negotiations, albeit at artificially low prices.  Under the first standard – the only one at issue in this case – "[c]ompetition is harmed **only** to the extent that the favored purchaser, by use of the discriminatory price difference, actually draws sales or profits from his unfavored competitor." *J. Truett Paine*, 607 F.2d at 1136.  The presence or absence of diverted sales goes hand in hand with this prong of the standard.  *See Cash*, 799 F.3d 214 (given "de minimis loss of sales, as well as of customers, to the favored purchasers," it "follows that [plaintiffs] also fail to raise a question of material fact with respect to" antitrust injury).  In the absence of evidence of diverted sales, the plaintiff may proceed under *Morton Salt,* which permits a plaintiff to use indirect evidence to create an inference of *potential* diversion. It is a nod to the "prophylactic" nature of the statute, which bars discrimination whose effect "**may** be substantially to lessen competition." *J. Truett Payne*, 451 U.S. at 561 (emphasis in original) (quoting statute); *F.T.C v. Morton Salt Co.,* 334 U.S. 37, 46 n.14 (1948). This may be enough to warrant an injunction, but for damages, lost profits "must" be "traced to the competitors' competitive **use** of their price advantage." *Drug Mart I*, 472 F. Supp. 2d at 424-25.  It follows that a failure to show diverted sales means that a plaintiff proceeding only under *Morton Salt* cannot show lost profits on diverted sales, or antitrust injury.  *Am. Booksellers Ass'n*, 135 F. Supp. 2d at 1040 (failure to show favored dealer passed on discounts negates showing of harm to plaintiff); *Stelwagon*, 63 F.3d at 1273-76 (dismissing claim because, even though the plaintiff satisfied *Morton Salt*, it did not sufficiently link lost sales to the price discrimination).

    B.    Stevens Creek's position:  Yes.  A plaintiff relying on lost sales due to not matching the favored competitors' prices needs to show actual diversion which may be based on evidence of the plaintiff's losing sales or market share and the favored competitors gaining sales or market share contemporaneous with the price discrimination.  *Alan's of Atlanta, Inc. v. Minolta Corp.*, 903 F.2d 1414, 1427-28 (11th Cir. 1990); *Hasbrouck v. Texaco, Inc.,* 842 F.2d 1034, 1042-43 (9th Cir. 1987), *aff'd*, 496 U.S. 543 (1990); *Falls City Indus. Inc. v. Vanco Beverage,* 460 U.S. 428, 433 n.4, 437 n.8 (1983).

22. *Can actual diversion be shown by evidence of a lowering of the retail prices of the favored dealer in relation to the prices of the disfavored dealer and the contemporaneous increase in the favored dealer's sales and decrease in the disfavored dealer's sales?*

A.   Chrysler's position:  *No.*  This question, posed by Stevens Creek, is an evidentiary question that concerns the admissibility and sufficiency of a proposed comparison among dealers.  But it is clear that a comparison of dealers' relative sales performance over two periods of time is not direct evidence of diversion.  Such an analysis does not speak to what specific customers did; nor is it proof that there was in fact any diversion.  Since it is not direct evidence of diversion, the next question is whether it constitutes admissible (and sufficient) indirect or circumstantial evidence of diversion.  But because there are many reasons why one dealer's sales can increase, while another's decreases, expert testimony is required to ensure that the comparison Stevens Creek wishes to make is reliable.  *Am. Booksellers Ass'n*, 135 F. Supp. 2d at 1042; *The Intimate Bookshop*, 2003 WL 22251312, at *4 (same); *see also Lott v. Westinghouse Savannah River Co.*, 200 F.R.D. 539, 546 (D.S.C. 2000).  ("The general rule is that statistical evidence must be supported by expert testimony.")  Here, for example, one dealer's sales could increase, while another's could decrease due to price sensitivity, changes in pricing strategies unrelated to incentives, or non-price factors.  Without an analysis that appropriately controls for these factors, the evidence cannot logically support the claim that there were diverted sales.  *Madani v. Equilon Enters. LLC*, 2009 WL 2148664, *11 (C.D. Cal. 2009) ("[F]ailure to account for other variables that may have affected plaintiffs' and their competitors' volumes renders [the] lost-sales analysis unreliable."); *see also, e.g.*, *Litton Sys., Inc. v. Honeywell, Inc.*, 1996 WL 634213, at *2 (C.D. Cal. 1996) (requiring disaggregation); *El Aguila Food Prods. v. Gruma Corp.*, 301 F. Supp. 2d 612, 625-626 (S.D. Tex. 2003) (a model that "assumes that all of the plaintiff's los[t] sales are a result of an antitrust injury … is unreliable").  As Stevens Creek's own expert admitted, "logically, you cannot infer that there was diversion just because one dealer performs better than its market opportunity and another dealer performs worse than its market opportunity as a result of the alleged incentive discrimination."  S1 Tr. 550.  Thus, to be admissible, the analysis must both (i) isolate the effects on each dealer's sales that is due to the alleged price discrimination, and (ii) isolate the changes in sales that were diverted, as opposed to lost due to mere price sensitivity.  This requires expert testimony that satisfies Rule 702.  Because a mere comparison of dealers' sales over time does not do this, it is neither admissible to show diversion, nor sufficient to support a jury verdict on that issue.

B.   Stevens Creek's position:  Yes.  Competitive and antitrust injury based on actual diversion may be shown by evidence of the plaintiff's losing sales or market share and the favored competitors gaining sales or market share contemporaneous with the price discrimination.  *Alan's of Atlanta, Inc. v. Minolta Corp.*, 903 F.2d 1414, 1427-28 (11th Cir. 1990); *Hasbrouck v. Texaco, Inc.,* 842 F.2d 1034, 1042-43 (9th Cir. 1987), *aff'd*, 496 U.S. 543 (1990); *Falls City Indus. Inc. v. Vanco Beverage,* 460 U.S. 428, 433 n.4, 437 n.8 (1983).  As this Court indicated in denying Chrysler's original motion to dismiss Stevens Creek's Section 2(a) claim based on the VGP incentives, the allegations that "without the benefit of the

23

subsidies [Stevens Creek's] monthly sales declined, while [the favored competitor's] sales increased during the same period when it reaped the benefits of the incentive program" were sufficient to make Stevens Creek's allegation of diverted sales "plausible."    Order Granting in Part and Denying in Part Defendant's Motions to Dismiss at 10-11 (ECF 45).

23.    *Is the plaintiff precluded from recovering damages for losses that may have been mitigated using commercially reasonable efforts?*

A.    Chrysler's position:  Yes.  *Golf City, Inc. v. Wilson Sporting Goods, Co.*, 555 F.2d 426, 436 (5th Cir. 1977) ("An antitrust plaintiff has a duty to mitigate damages."); *Fishman v. Estate of Wirtz*, 807 F.2d 520, 559 (7th Cir.1987) (same); *Marin v. Evans*, 2007 WL 655456 (E.D. Wash. 2007) (looking to antitrust law in determining that duty to mitigate applies in RICO claims).

B.    Stevens Creek's position:  Not in the way that Chrysler intends to argue in this case which is that Stevens Creek should have priced its vehicles as if it would receive the incentives in order to avoid losing sales to the favored dealers' incentive-subsidized prices.  Because a plaintiff may show antitrust injury arising from a Section 2(a) violation by evidence either of sales lost to a favored competitor because plaintiff did not lower its price to match the favored competitor's price or of profits lost because it did lower its price to match the favored competitor's price, there clearly is no duty imposed on the plaintiff to mitigate damages by lowering its prices to match the favored dealers' incentive-subsidized prices.

24.    *In the context of a price discrimination claim involving the sale of new vehicles, does the antitrust injury requirement preclude recovery for lost profits on the purchase and/or sale of used vehicles, parts, or service?*

A.    Chrysler's position:  Yes.  "A private plaintiff may **not** recover damages under § 4 of the Clayton Act merely by showing 'injury' … *causally* related to an antitrust violation."  *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990) (emphasis added). Rather, damages are limited to "antitrust injury," which is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful."  *Id.* The RPA was designed to protect competition in the market for goods of "like grade and quality;" here, new Chrysler vehicles. It was not designed to protect competition in the used car market or the parts and services markets.

B.    Stevens Creek's position:  No.  Once antitrust injury is established, a plaintiff is entitled to recover the amount of damages that will place it in the same position as it would have been "but for" the violation.  *L.A. Mem'l Coliseum Com'n v. NFL,* 791 F.2d 1356, 1367 (9th Cir. 1986).  Accordingly, lost profits from the purchase and/or sale of used vehicles, parts, or service that plaintiff would have made but

for the violation are recoverable as damages in addition to its lost new vehicle sales.

25. *Must a plaintiff's damages estimate exclude pre-judgment interest, including interest based on either a statutory interest rate or a different interest rate.*

A. <u>Chrysler's position</u>: Yes. *See* 15 U.S.C. § 15(a)(1)-(3) (under antitrust damages statute, award of interest permitted only on motion to court and requires that defendant engaged in "bad faith," "dilatory behavior" or other vexatious conduct in order to delay the action); *Auraria Student Housing at Regency, LLC v. Campus Village Apartments, LLC*, 2014 WL 4651643 (D. Colo. 2014) ("calculations of … present value … are in substance nothing other than calculations of prejudgment interest [and] may not be awarded … without a showing of bad faith); *In re Linerboard Antitrust Litig.*, 504 F. Supp. 2d 38, 63-66 (E.D. Pa. 2007) (agreeing with Areeda & Hovenkamp that *Multiflex* cases "decided erroneously" and pre-judgment interest is impermissible without § 15(a) justification); *Woodard v. Goodell Bros.*, 1987 U.S. Dist. LEXIS 14549, at *11-12 (D. Colo. 1987) (inflation adjustment disallowed); *see also, e.g., Locklin v. Day-Glo Color Corp.*, 429 F.2d 873, 876 (7th Cir. 1970) (affirming trial court's refusal to account for inflation).

B. <u>Stevens Creek's position</u>:  Yes, as a general rule. However, several courts have allowed recovery of the present value of past lost profits because it does not involve prejudgment interest on a liquidated sum.  *Multiflex, Inc. v. Samuel Moore & Co.*, 709 F.2d 980, 996-97 (5th Cir. 1985), disavowed on other grounds by *Deauville Corp. v. Federated Dep't Stores*, 756 F.2d 1183 (5th Cir. 1985); *H.J. Inc. v. ITT*, 867 F.2d 1531, 1549 (8th Cir. 1989) ("the proper measure of damages is the present value of profits lost"); *Weyland v. Birkholz*, 2008 WL 649602, at *1 (E.D. Ky. 2008).  *But see, Auraria Student Housing at Regency, LLC v. Campus Village Apartments, LLC*, 2014 WL 4651643 (D.C. Colo.).

## IV.  ESTIMATE OF TRIAL TIME.

The Parties state jointly that they estimate trial will require 11 trial days consisting of approximately 85 hours of courtroom time.

## V.  TRIAL ALTERNATIVES AND OPTIONS.

### A.  Settlement Discussion.

The parties state jointly that they engaged in one formal mediation according to the Court's procedures, which was not successful.  Further settlement discussions have recently commenced and are in process at the time of this writing.

**B.      Amendments or Dismissals.**

The parties state jointly that after the Court's various decisions on Chrysler's motions to dismiss, the remaining claims were (i) Stevens Creek's Section 2(a) claim relating to the four month period following the entry into the market of San Leandro in (December 1, 2010-March 31, 2011) and the 12-month period following the entry of Fremont (July 1, 2012-June 30, 2013); and (ii) its "failed delivery" claim under Section 11713.3(a) of the California Vehicle Code.  In response to Chrysler's motion to compel evidence in support of the failed delivery claim, Stevens Creek stated that it would withdraw its failed delivery claim, and does so now. ECF 143 at 4-5.   Stevens Creek has also conceded that its expert did not find, with a statistically significant degree of precision, that Stevens Creek suffered injury relating to San Leandro's entry.  *See* Stockton Rpt. ¶¶ 17, 67, Tab 25; Stockton Tr. at 109.  Accordingly, Stevens Creek no longer seeks damages relating to the four month period following San Leandro's entry.

**C.      Bifurcation or Separate Trial of Issues.**

The parties state jointly that neither bifurcation nor separate trial of specific issues is warranted.

**D.      Appendices to Pretrial Order.**

The following Appendices are attached hereto:

- Appendix A1 –  Plaintiff's Witness List
- Appendix A2 –  Defendant's Witness List
- Appendix B  –  Joint Exhibit List
- Appendix B1 –  Plaintiff's Exhibit List and Defendant's Objections Thereto
- Appendix B2 –  Defendant's Exhibit List and Plaintiff's Objections
- Appendix C1 –  Plaintiff's Discovery Designations and Defendant's Objections Thereto
- Appendix C2 –  Defendant's Discovery Designations and Plaintiff's Objections Thereto

Joint Pretrial Statement
13-cv-04236-BLF

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**E.      *Stipulation Regarding Demonstrative Exhibits.***

The parties agree that demonstratives do not need to be included on the trial exhibit lists filed herewith and will be exchanged pursuant to a schedule to be agreed between the parties.

**F.      *Binding Effect of the JPSO.***

The foregoing admissions having been made by the parties, and the parties having specified the foregoing issues of fact and law remaining to be litigated, this order shall supplement the pleadings and govern the course of trial of this action, unless modified to prevent manifest injustice. Date and signature lines for the Court shall appear immediately following the parties' signature lines.

Joint Pretrial Statement
13-cv-04236-BLF

***Counsel for Plaintiff***
Mathew Enterprise, Inc.

*/s/ Paul R. Norman*
Paul R. Norman, admitted *pro hac vice*
Eric A. Baker, admitted *pro hac vice*
Andrew N. DeClercq, SBN 262597
BOARDMAN & CLARK, LLP
1 S. Pinckney St., Suite 410
Madison, WI 53703
T: (608) 257-9521
F: (608) 283-1709

Ali Kamari, SBN 175977
INHOUSE COUNSEL
1 Almaden Bl., Suite 810
San Jose, CA 95113
T: (408) 918-5393
F:  (408) 918-5373

Michael J. Flanagan, SBN 093772
Gavin Hughes, SBN 242119
LAW OFFICES OF MICHAEL J. FLANAGAN
2277 Fair Oaks Blvd., Suite 450
Sacramento, CA 95825
T:  (916) 646-9100
F:  (916) 646-9138


SO ORDERED

***Counsel for Defendant***
FCA US LLC

*/s/ David A. Munkittrick*
Colin R. Kass, admitted *pro hac vice*
Scott M. Abeles, admitted *pro hac vice*
PROSKAUER ROSE LLP
1001 Pennsylvania Ave., N.W.
Washington, DC 20004
T: (202) 416-6800
F: (202) 416-6900

David A. Munkittrick, admitted *pro hac vice*
PROSKAUER ROSE LLP
11 Times Square
New York, NY 10036
T: (212) 969-3000
F: (212) 969-2900

Robert E. Davies, SBN 106810
DONAHUE DAVIES LLP
P.O. Box 277010
Sacramento, CA 95827-7010
T: (916) 817-2900
F: (916) 817-2644


_____

HONORABLE BETH LABSON FREEMAN