United States District Court
Northern District of California

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| MATHEW ENTERPRISE, INC., Stevens Creek, <br><br> v. <br><br> CHRYSLER GROUP LLC, Chrysler. | Case No. 13-cv-04236-BLF <br><br> **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** <br><br> [Re: ECF 166] |

Plaintiff, Mathew Enterprise, Inc., a Chrysler, Jeep, Dodge and Ram ("CJDR") dealer operating as Stevens Creek CJDR ("Stevens Creek"), alleges that Defendant Chrysler Group LLC ("Chrysler") offered incentive payments to other CJDR dealers in Northern California but not to Stevens Creek in violation of § 2(a) of the Robinson-Patman Act ("RPA"). Stevens Creek initially brought four claims, but only the § 2(a) claim for damages remains. Chrysler now asks the Court to grant summary judgment in its favor on that claim. For the reasons below, the Court GRANTS IN PART and DENIES IN PART Chrysler's motion.

I.      **BACKGROUND**

A.  **Preliminary Facts**

The Court begins by summarizing preliminary facts, which the parties have not deemed to

be material, but the Court includes as background.[1] Chrysler manufactures and distributes CJDR vehicles through a network of authorized dealers, including Stevens Creek. Ans. ¶¶ 9-11, ECF 57. Stevens Creek has been a CJDR dealer in San Jose, California since 2006, before alleged competitors San Leandro CJDR ("San Leandro") and Fremont CJDR ("Fremont") entered the market. *See* Zaheri Decl. ¶ 3, ECF 197; Ans. ¶¶ 21, 31. While Stevens Creek's pleadings focus on competition with San Leandro and Fremont, it also identifies other CJDR dealers to whom Chrysler sells vehicles in Northern California, including Putnam CJDR ("Putnam") and Normandin CJDR ("Normandin"). Ans. ¶ 14; Stockton Report ("Stockton") Tab 3 at 1, ECF 171-5. The Court refers to Fremont, San Leandro, Putnam, and Normandin collectively as "Surrounding Dealers."[2]

Chrysler assists dealers by offering them incentive programs. Ans. ¶ 18. For example, in or about April 2011, Chrysler implemented the Volume Growth Program ("VGP"), under which Chrysler provided incentive payments to dealers that met or exceeded sales objectives. *Id.* ¶¶ 18, 30. Some of the sales objectives were set monthly, based in part on the dealer's sales history. *Id.* ¶¶ 18-19; *see also* Def.'s Exh. 13 (Thompson Depo.) at 86:12-16, ECF 171-10. With the exception of April 2012, Stevens Creek met its monthly sales objectives from July 2011 through June 2012. Ans. ¶ 29.

**B.  Undisputed Facts**

The following facts are undisputed unless otherwise noted.[3] Once a dealer earns its VGP incentive payments, Chrysler does not require dealers to use the VGP payments for any particular purpose. Thompson Depo. at 15:1-14. In the ordinary course of business, Stevens Creek used its payments to lower prices to price-sensitive customers or to increase its profits. Def.'s Exh. 3 (No.

---

[1] For ease of reference, the Court cites to the paragraphs of Chrysler's Answer in which Chrysler admits Stevens Creek's allegations. The corresponding paragraphs of Stevens Creek's complaint contain the relevant allegations.
[2] As noted below, the Court does not use the term "favored dealers" because the favored status of some of these dealers is disputed.

[3] The parties' separate statements of fact contain impermissible legal argument. Accordingly, the Court STRIKES all legal arguments and considers only the statement of fact and the statement of "disputed" or "undisputed" with citations.

United States District Court
Northern District of California

United States District Court
Northern District of California

20). From April 2011 through June 2012, Stevens Creek's average transaction price for a vehicle was $30,699, *see* Def.'s Exh. 10 (Woroch Report) ¶ 55, ECF 173-12, while incentives averaged over $700 per vehicle or about 2.3% of the average price, *see* Stockton ¶ 41, ECF 171-5.

In June 2012, Fremont became an authorized CJDR dealer. From June 2012 to June 2013, Chrysler continued to base Stevens Creek's monthly objectives in part on Stevens Creek's sales history from the prior year without taking into account Fremont's entry into the market. At the same time, Chrysler calculated Fremont's sales objectives using a different formula. Stockton Report ¶¶ 40-41; *see also* Def.'s Exh. 5 (No. 7). A year after Fremont's entry, objectives for all relevant dealers were set using the same formula. (That occurred because Fremont then had a sales history on which to base its incentive benchmarks.)

In the year following Fremont's entry, Stevens Creek missed its VGP incentives each month from July 2012 to June 2013. In July 2012, Stevens Creek earned a "fast start" payment—which is different from a VGP payment—and tried but failed to meet its VGP objective. Stockton Tab 14 at 1, ECF 173-7. Stevens Creek received no incentive payments from August 2012 to June 2013. *Id.* at 1. In contrast, Fremont earned its incentives in each month over that period. *Id.* at 1. For the purposes of this motion, the parties agree that if the definition of a "Favored Dealer" is one that earned its incentives, Fremont was a Favored Dealer from at least August 2012 through June 2013. *See* Reply Statement of Undisputed Facts ("Reply Statement") (Fact No. 30), ECF 228.

Over the same period, other Surrounding Dealers sometimes earned and sometimes missed their incentives. *Id.*; *see also* Stockton Tab 14 at 1. Specifically, in the 12 months following Fremont's entry, Normandin met its objectives five times, San Leandro met its objectives eight times, and Putnam met its objectives two times. Stockton Tab 14 at 1. As a result, the parties dispute whether San Leandro, Normandin, and Putnam were also Favored Dealers from August 2012 to June 2013 because they did not receive incentives in some months but enjoyed greater average incentives than Stevens Creek over the entire period. *Id.* at 1.

For the purposes of this motion, the parties do not dispute that the alleged incentive discrimination caused Stevens Creek to lose sales from August 2012 through June 2013. *See* Reply Statement (Fact No. 47). This price discrimination did not cause Stevens Creek to raise its

3

United States District Court
Northern District of California

1    published or advertised prices, *see* Def.'s Exh. 3 (Interrog. No. 12), but Stevens Creek did raise its

2    actual prices, on average, by approximately the amount of the lost incentives. *See* Def.'s Exh 8

3    (Stockton Depo. 3) at 749:21-24. The missed incentives did not drive Stevens Creek from the

4    market. *Id.* at 793:19-23.

5          Stevens Creek has not identified any customer that purchased a vehicle of like grade and

6    quality from a Favored Dealer after negotiating with Stevens Creek, nor does Stevens Creek have

7    any evidence of "specific customers or the number of customers who compared Stevens Creek's

8    retail prices with those of a [Surrounding] Dealer" or who did not purchase from Stevens Creek

9    because the Surrounding Dealers' retail prices were lower. Def.'s Exh. 2 (Interrog. Nos. 15-18),

10   ECF 171-2; *see also* Def.'s Exh 12 (Zaheri Depo.) at 34:21- 35:8, ECF 173-16. Similarly, Stevens

11   Creek does not know how many customers negotiated with it but instead bought a vehicle of

12   another brand, a different CJDR vehicle, or no vehicle at all. *Id.* at 131:14-132:20. Stevens Creek's

13   expert also does not have any "specific knowledge of the purchasing practices of specific

14   customers" or "what the cross elasticity of demand is between Stevens Creek and any particular

15   dealer." Stockton Depo. 1 at 260:5-22. In addition, Stevens Creek has not conducted a survey of

16   customers, nor has Stevens Creek compared a list of customers that contacted but did not purchase

17   a vehicle from it to Surrounding Dealers' customer lists from the relevant period. *Id.* at 520:1-22.

18   **II.    LEGAL STANDARD**

19         "A party is entitled to summary judgment if the 'movant shows that there is no genuine

20   dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *City of*

21   *Pomona v. SQM North America Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014) (quoting Fed. R. Civ.

22   P. 56(a)). "The moving party initially bears the burden of proving the absence of a genuine issue

23   of material fact." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex*

24   *Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "Where the non-moving party bears the burden of

25   proof at trial, the moving party need only prove that there is an absence of evidence to support the

26   non-moving party's case." *Id.*

27         "Where the moving party meets that burden, the burden then shifts to the non-moving

28   party to designate specific facts demonstrating the existence of genuine issues for trial." *Id.* "[T]he

non-moving party must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor." *Id.*

"The court must view the evidence in the light most favorable to the nonmovant and draw all reasonable inferences in the nonmovant's favor." *City of Pomona*, 750 F.3d at 1049. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *Id.* (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

### III.    DISCUSSION

Chrysler seeks summary judgment on Stevens Creek's remaining damages claim for price discrimination under § 2(a) of the RPA, 15 U.S.C. § 13(a), which makes it "unlawful for any person engaged in commerce . . . to discriminate in price between different purchasers of commodities of like grade and quality . . . where the effect of such discrimination may be substantially to lessen competition." 15 U.S.C. § 13(a).

Through § 2(a), Congress "sought to target the perceived harm to competition occasioned by powerful buyers, rather than sellers; specifically, Congress responded to the advent of large chainstores, enterprises with the clout to obtain lower prices for goods than smaller buyers could demand." *Volvo Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc.*, 546 U.S. 164, 175 (2006). At the same time, "Robinson-Patman does not ban all price differences charged to different purchasers of commodities of like grade and quality; rather, the Act proscribes price discrimination only to the extent that it threatens to injure competition." *Id.* at 177 (internal citation omitted). In other words, the Act is intended to stimulate competition, not to protect existing competitors. *Id.* at 181.

Where, as here, a plaintiff seeks damages for price discrimination, the plaintiff must establish both "competitive injury" and "antitrust injury." For an injunction, "all that is required . . . is proof that competitive injury *may* result." *Hasbrouck v. Texaco, Inc.*, 842 F.2d 1034, 1042 (9th Cir. 1987), aff'd, 496 U.S. 543 (1990) (emphasis in original). To recover damages, however a plaintiff must also show "antitrust injury," which requires "some showing of actual injury and causation." *Id.* at 1041. Chrysler argues that Stevens Creek lacks evidence to establish either form of injury, and the Court considers each in turn.

United States District Court
Northern District of California

### A.  Competitive Injury

To establish competitive injury, a plaintiff must "show that (1) the relevant . . . sales were made in interstate commerce; (2) the [goods] were of 'like grade and quality'; (3) [the seller] 'discriminated in price between' [the plaintiff] and another purchaser of [the goods]; and (4) 'the effect of such discrimination may be . . . to injure, destroy, or prevent competition' to the advantage of a favored purchaser." *Volvo*, 546 U.S. at 176-77 (quoting 15 U.S.C. § 13(a)). Here, Chrysler challenges Stevens Creek's proof regarding only the last element.

A plaintiff may establish the last element either directly, through evidence that sales or profits were diverted from a disfavored purchaser to a favored purchaser, or indirectly, through evidence that a "favored competitor received a significant price reduction over a substantial period of time," which gives rise to what is called a *Morton Salt* presumption. *Id.* at 177; *see also Fall City Industries, Inc. v. Vanco Beverages, Inc.*, 460 U.S. 428, 437-38 (483); *FTC v. Morton Salt Co.*, 334 U.S. 37, 49-51 (1948). Chrysler argues that Stevens Creek lacks evidence to make either showing here, *see* Mot. at 10-19, ECF 166, and the Court considers each option in turn.

### 1.  Direct Evidence of Diverted Sales or Profits

Chrysler contends that Stevens Creek lacks evidence to directly show competitive injury through diversion of sales or profits to a favored competitor because, as noted above, it is undisputed that Stevens Creek cannot identify any customers who (1) did not purchase a vehicle from Stevens Creek because a Surrounding Dealer offered a lower price, (2) purchased a similar vehicle from a Surrounding Dealer after negotiating with Stevens Creek, (3) informed Stevens Creek that s/he had received a lower offer from a Surrounding Dealer, or (4) even compared Stevens Creek's prices to those of a Surrounding Dealer. *See* Def.'s Exh. 2 (Interrog. Nos. 15-18).

To argue that such evidence is necessary, Chrysler relies on *Volvo*, which considered an RPA claim brought by a Volvo dealer to challenge Volvo for failing to offer identical concessions to dealers bidding for the same custom projects. *Volvo*, 546 U.S. at 169-71. As evidence, the plaintiff offered two instances where it directly competed with another Volvo dealer for the same project, including one where the plaintiff lost to the allegedly favored competitor, but in both cases Volvo in fact offered the dealers matching concessions for their bids. *Id.* at 172, 180. The plaintiff

United States District Court
Northern District of California

also compared concessions Volvo gave to it and other dealers, but for different sales. *Id.* The

Supreme Court found these comparisons insufficient to show diverted sales because "in none of

the discrete instances . . . did [the plaintiff] compete with beneficiaries of the alleged

discrimination *for the same customer.*" *Id.* at 178 (emphasis in original). As detailed above,

Chrysler argues that Stevens Creek similarly cannot show competition for the same customer.

Stevens Creek first opposes Chrysler's reading of the law. Stevens Creek argues that, to

directly establish diverted sales, it need only show that it competed with Favored Dealers[4] in a

common geographic market. Opp. at 18, ECF 194. Stevens Creek relies on *Stelwagon Mfg. Co. v.

Tarmac Roofing Sys.*, 63 F. 3d 1267 (3d Cir. 1995), which states that such a showing is necessary

"as a *prerequisite* to establishing . . . injury"—not that it suffices to prove competitive injury. *Id.*

at 1271 (emphasis added). Rather, like *Volvo*, *Stelwagon* explains that under the direct evidence

standard, proof of competitive injury requires a plaintiff to offer proof of "lost sales or profits." *Id.*

at 1272.[5] Or, as more clearly stated by the Supreme Court in *Volvo,* "[a] hallmark of the requisite

competitive injury, our decisions indicate, is the diversion of sales or profits from a disfavored

purchaser to a favored purchaser." 546 U.S. at 177. Thus, as Chrysler correctly argues, evidence

that Stevens Creek sought to sell the same vehicles in the same geographic market as Favored

Dealers would not suffice to present diverted sales as a triable issue. *See* Reply at 3-4. Chrysler

has therefore met its burden to demonstrate that there is an absence of evidence to show diverted

sales, thereby shifting the burden to Stevens Creek.

Stevens Creek responds with two pieces of evidence, its expert's opinion and its owner's

testimony, that it argues should suffice. Opp. at 21-22. First, Stevens Creek offers analysis by its

expert, Edward M. Stockton, who compares Stevens Creek's "mass" (i.e., actual sales as a

---

[4] As noted in the Background Section, the parties agree that Fremont was a Favored Dealer from August 2012 through June 2013, but disagree as to whether the other Surrounding Dealers qualify as Favored Dealers over the entire period or only during certain months.

[5] *Stelwagon* offers no additional guidance regarding the "same customer" requirement as it found the plaintiff's evidence sufficient for a *Morton Salt* presumption and therefore did not consider the evidence of diverted sales for competitive injury. As discussed further below, however, *Stelwagon* did find the evidence of lost sales and profits to be insufficient for antitrust injury and, in doing so, specifically noted that the plaintiff "failed to identify a single lost customer." 63 F.3d at 1274-76.

United States District Court
Northern District of California

1   percentage of expected sales) to the masses of Surrounding Dealers before, during, and after the

2   alleged price discrimination.[6] Chrysler argues, and the Court agrees, that these calculations miss

3   the mark because they consider *total* lost sales, rather than sales lost to a favored competitor.

4   Plaintiff's expert, having apparently invented his own definition of diversion, mistakenly opines

5   that "there can be diversion even if no customer that declined to purchase from Stevens Creek later

6   purchased a similar vehicle from a favored dealer" and that diversion "does not have to be [to] a

7   favored dealer." Def.'s Exh. 8 (Stockton Depo. 3) at 545:1-6, 542:4-9, 546:18-24, ECF 171-4.

8   This analysis misreads the requirements of the RPA. *See Volvo*, 546 U.S. at 176-77 (one element

9   of competitive injury is that "'the effect of such discrimination may be . . . to injure . . .

10  competition' *to the advantage of a favored purchaser*") (emphasis added); *see also Cash &*

11  *Henderson Drugs, Inc. v. Johnson & Johnson*, 799 F.3d 202, 206 (2d Cir. 2015) (affirming district

12  court's focus on sales lost to favored purchasers in finding no competitive injury).[7] Accordingly,

13  Stevens Creek's proffer of Mr. Stockton's calculations, which offer no evidence of sales lost to

14  allegedly favored competitors, does not make diverted sales a triable issue.

15      Second, Stevens Creek offers testimony by Mathew Zaheri, Stevens Creek's owner,

16  regarding his "personal knowledge of customers who declined Stevens Creek's lowest offer and

17  bought from a Favored Competitor instead." Zaheri Decl. ¶ 16, ECF 197. Chrysler argues that any

18  such testimony will be inadmissible as hearsay because Mr. Zaheri conceded in his deposition that

19  he knows neither the number nor names of diverted customers, and instead relies on his employees

20  to follow up with any customers who did not buy from Stevens Creek. Zaheri Depo. at 141:4-15.

---

[6] According to Mr. Stockton's calculations, before the alleged discrimination, Stevens Creek had a greater mass than any existing Surrounding Dealer. Stockton Tab 17 at 6, 8-10, ECF 171-6. During the alleged discrimination period, Stevens Creek's mass fell—as did Putnam's, but by fewer percentage points—while San Leandro and Normandin's masses both rose. *Id.* Mr. Stockton could not analyze a change for Fremont over that period, as Fremont had no pre-discrimination period sales to which to compare, though Mr. Stockton did find that Fremont's mass rose from August 2012 to June 2013 as Stevens Creek' mass fell. After the discrimination, Stevens Creek's mass rebounded, growing by more percentage points than Normandin's or Fremont's did, while San Leandro and Putnam's masses both fell. *Id.* at 6-10.

[7] Though the parties discuss *Cash* at length in their arguments regarding direct evidence, the Court addresses *Cash* more fully in the *Morton Salt* Presumption section below, as the plaintiffs in *Cash* essentially agreed that they lacked sufficient evidence to establish competitive injury directly and instead focused their dispute on the applicability of *Morton Salt*.

The Court agrees that any testimony by Mr. Zaheri on customer diversion will necessarily constitute inadmissible hearsay. *See Stelwagon*, 63 F. 3d at 1274-76 (finding conversations the plaintiff's employees had with diverted customers inadmissible as hearsay); *see also J. Truett Payne Co. v. Chrysler Motors Corp.,* 451 U.S. 557, 570 (1981) (Powell, J., dissenting in part) (describing testimony by president of car dealership based on his salesmen's conversations with customers as conclusory and hearsay).

Furthermore, while the Court agrees with Stevens Creek that matching is not the only way to show sales diversion, *see* Opp. at 19, the Court also agrees with Chrysler that Stevens Creek fails to offer any direct evidence—through matching or otherwise—of sales lost to favored purchasers. Therefore, Stevens Creek has failed to meet its burden to offer evidence that could lead a rational trier of fact to find that Stevens Creek suffered competitive injury based on diverted sales or profits. Accordingly, the Court GRANTS Chrysler's Motion for Summary Judgment to the extent that it seeks a determination that Stevens Creek cannot establish competitive injury directly, through evidence of diverted sales, at trial.

### 2. *Morton Salt* Presumption

However, as noted above, Stevens Creek may instead establish competitive injury "prima facie by proof of substantial price discrimination between competing purchasers over time." *Falls City Indus.*, 460 U.S. at 435 (citing *FTC v. Morton Salt*, 334 U.S. at 46-47); *see also Volvo*, 546 U.S. at 177; *Hasbrouck*, 842 F.2d at 1041. Chrysler argues that Stevens Creek has insufficient evidence to proceed on an indirect case as well.

As discussed in the Background Section, for the purposes of this motion, the parties do not dispute that the alleged discrimination caused Stevens Creek to lose sales for eleven months, from August 2012 through June 2013,[8] *see* Reply Statement of Facts (Fact No. 40), or that the incentives Chrysler offered averaged about 2.3 percent or $700 per vehicle. Rather, the parties dispute whether or not this evidence warrants a *Morton Salt* presumption.

Chrysler argues that Stevens Creek has failed to develop any evidence to support a *Morton*

---

[8] Stevens Creek contends that the discrimination also occurred in July 2012, when Stevens Creek received a "fast track" payment but not a VGP payment.

United States District Court
Northern District of California

*Salt* presumption of competitive injury because it has put forth evidence of injury to a competitor—itself—instead of injury to competition. Chrysler urges that a 2.3 percent price difference over 11 months fails as a matter of law to qualify as evidence that a favored competitor received a significant price reduction over a substantial period of time. Moreover, Chrysler argues that after *Volvo*, the Court must further consider whether the price reduction's likely impact is consistent with a cognizable competitive injury. Chrysler urges this Court to conclude that there is an absence of indicia of competitive injury, thus rendering an inference of competitive injury unwarranted. Mot. at 16-19.

In support of its premise that a 2.3 percent reduction over 11 months fails as a matter of law, Chrysler relies on two cases. First, Chrysler offers *S & W Const. & Materials Co. v. Dravo Basic Materials Co.*, 813 F. Supp. 1214 (S.D. Miss. 1992), *aff'd*, 1 F.3d 1238 (5th Cir. 1993), which considered a $.50, or 4 percent, price advantage in construction materials over nine months. *Id.* at 1222.  The *S&W* court declined to apply a *Morton Salt* presumption because, unlike the parties in *Morton Salt*, the parties in *S&W* were not "market leaders in a highly competitive market in which minor price differences significantly affected competitors' low profit margins." The 4 percent difference over nine months therefore "simply [did] not warrant any reasonable prospect of a substantial lessening of competition." *Id.* at 1222.

Chrysler also offers *Olympia Co. v. Celotex Corp.*, 597 F. Supp. 285 (E.D. La. 1984), *aff'd and remanded*, 771 F.2d 888 (5th Cir. 1985), which considered a $1,000 price differential in roofing materials over six instances of competition. *Id.* at 297. In that case, the plaintiff's expert agreed that the differential was "'definitely' de minimus." *Id.* at 297. Relying on that testimony, the court refused to apply a *Morton Salt* presumption because "[i]t is inconceivable that the de minimus price differential at issue could . . . have . . . a substantial, if any, effect on competition." *Id.* at 297.

Here, neither the *S&W* nor the *Olympia* court's reasoning applies. First, unlike the plaintiff in *S&W*, Stevens Creek offers evidence to show that the CJDR market is highly competitive and that minor price differences significantly affect competitors' profit margins. Specifically, Stevens Creek offers deposition testimony by Drew Coronel, Fremont's General Manager, that Fremont's

1   gross profits on new vehicles would have averaged only $40 per unit without the incentive

2   payments from July 2012 through June 2013, Coronel Depo. at 253:17-23, and deposition

3   testimony from Lisa Castro, San Leandro's Controller, stating that San Leandro's average gross

4   profit per unit sold in 2012 was negative $202.04 excluding incentive payments, Castro Depo. at

5   40:3-8, 50:15-52:7. Second, unlike the expert in *Olympia*, Stevens Creek's expert does not

6   concede that the $700/vehicle price differential is de minimis and Defendant's own expert testified

7   that Stevens Creek's price increase relative to Normandin, San Leandro, and Putnam caused, at

8   least in large part, Stevens Creeks' sales to fall during the alleged price discrimination period. *See*

9   Pl.'s Exh. 11 (Woroch Depo.) at 98:17-22, ECF 205-2.[9]

10       Therefore, just as the Court was "not willing to state that, as a matter of law, pleading

11  sixteen months of injury is insufficient to plead a 'significant period of time,'" *see* First Dismissal

12  Order at 11, the Court is not now willing to state as a matter of law that a 2 percent difference—

13  translating to $700 per vehicle—over 11 months is de minimis in a price-sensitive market with

14  low profit margins. *See Alan's of Atlanta, Inc. v. Minolta Corp.,* 903 F.2d 1414, 1428 n. 20 (11th

15  Cir. 1990) ("the *de minimis* doctrine . . . does not depend on the large or small amount of the price

16  discrimination *per se*. It depends on the large or small effect that the price discrimination has on

17  business rivalry."). The effect of the price difference is a disputed issue of fact that will be left for

18  the jury to determine.[10]

19       The Court is not persuaded otherwise by Chrysler's argument that, after *Volvo*, a plaintiff

---

[9] Chrysler also offers *In re Fred Bronner Corp.*, 57 F.T.C. 771 (1960), a Federal Trade Commission opinion that considered a 3% discount offered to wholesalers on toys, resulting in total annual discounts of at most $753.14. The FTC refused to apply a *Morton Salt* presumption because it was not persuaded by the "automotive parts" cases the plaintiff offered. Specifically, the FTC distinguished *Fred Bronner* because, unlike automotive parts, the toy market did not exhibit "unusually keen competition," "small markups on individual products," and high rebates. *Id.* at *10. In other words, the distinguishing factors the Commission relied upon to differentiate from automotive cases are precisely the factors that are present to distinguish this case from *Fred Bronner*. Therefore, the Court finds *Fred Bronner* as unpersuasive as *S&W* and *Olympia*.

[10] Chrysler additionally argues that, even if 2 percent over 11 months could warrant a *Morton Salt* inference, it should not in this case because this price difference is not likely to have "a consistent, deleterious effect" on Stevens Creek's ability "to win or keep specified business" from favored dealers. Because this argument essentially restates the contention rejected above—that 2 percent over 11 months cannot be material as a matter of law—it fails for the reasons discussed above.

must not only show that a "favored competitor received a significant price reduction over a substantial period of time," but must also offer "indicia of competitive injury" to get the benefit of the presumption. While the Court agrees that *Volvo* established that courts must "resist interpretation geared more to the protection of existing *competitors* than to the stimulation of *competition*," *Volvo*, 546 U.S. at 181 (emphasis in original), the Court does not read *Volvo* to alter *Morton Salt*'s requirements of "substantial price discrimination between competing purchasers over time." *Falls City Indus.*, 460 U.S. at 435. Rather, in *Volvo*, the Supreme Court found that the plaintiff failed to offer evidence of those requirements. Specifically, the Supreme Court determined that the plaintiff had established neither the substantiality of the alleged price discrimination, *see* 546 U.S. at 180 (the plaintiff failed to show "that [it] was *disfavored* vis-à-vis other Volvo dealers in the rare instances in which they competed for the same sale,"), nor that price discrimination occurred between "competing purchasers," *see id.* at 179 (the plaintiff's "comparisons fail to show that Volvo sold at a lower price to [the plaintiff's] 'competitors.'"). Thus, *Volvo* applied but did not alter or heighten the requirements for a *Morton Salt* presumption.

Chrysler's reliance on *Cash* to block a *Morton Salt* presumption here is similarly unpersuasive. *Cash* considered a claim brought by pharmacies against drug manufacturers for offering drugs at lower prices to competing providers. Because of the number of parties involved, the case went through two rounds of summary judgment brought by different groups of plaintiffs. 799 F.3d 207. In the first round, the district court denied the defendants' motion with respect to competitive injury but found that the designated plaintiffs had "failed to show that they, individually, suffered antitrust injury" and therefore granted summary judgment on the damages claim. *Id.* at 207. That order was not appealed.

The remaining plaintiffs then decided "to cure the fatal defect in the . . . case" by "attempt[ing] to identify customers they had lost to the favored purchasers" but the matching process revealed "that the plaintiffs had lost a minuscule number of customers [at most, 3 percent] to favored purchasers." *Id.* at 207-08. The defendants then moved for summary judgment on competitive injury again, and the district court granted it in light of the new evidence. *Id.* at 208.

On appeal, the plaintiffs argued that they were "entitled to an inference of competitive

injury under the *Morton Salt* doctrine." *Id.* at 211. The Second Circuit disagreed, explaining that "the *Morton Salt* inference is simply an inference and may be rebutted," and held that "[t]he *de minimis* results of the matching process . . . are sufficient to rebut a contrary inference created by *Morton Salt*." *Id.* at 211, 213 (internal citation omitted). In other words, the Second Circuit found that the conclusive matching evidence provided by the plaintiffs rebutted the *Morton Salt* presumption—not that no such presumption was available in the first place. To the contrary, on the first motion for summary judgment, the trial court found the evidence of competitive injury sufficient to survive summary judgment.

Here, Chrysler argues only that Stevens Creek cannot establish the presumption—not that, even if a *Morton Salt* inference is available, Chrysler has sufficient evidence to rebut it. Therefore, the applicability of a *Morton Salt* presumption is a disputed—and rebuttable—issue for trial.[11] Accordingly, Chrysler's motion for summary judgment regarding competitive injury as established through a *Morton Salt* presumption is DENIED.

### B. Antitrust Injury

Chrysler next argues that, even if Stevens Creek successfully offers evidence to show competitive injury, Stevens Creek cannot show antitrust injury, which is also necessary for its damages claim. Under § 4 of the Clayton Act, only a "person who *shall be* injured in his business or property" may recover damages. 15 U.S.C. § 15. Therefore, for damages, a plaintiff must also show "antitrust injury," which requires "some showing of actual injury and causation." *Hasbrouck*, 842 F.2d at 1041.

Chrysler relies on *J. Truett Payne* to argue that Stevens Creek cannot prove the necessary injury here. In *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 562 (1981)*,* a car dealer that went out of business sued Chrysler for requiring it to meet a higher sales objective than other dealers had to before receiving incentive payments, resulting in $81,248 in price discrimination. 451 U.S. at 559-60. At trial, the plaintiff offered testimony by its owner, who relied on his salesmen's opinion that the dealership lost sales to competitors, and also testified that

---

[11] The Court cautions Plaintiff that gaps in its evidence may make it difficult to withstand Chrysler's anticipated rebuttal evidence.

the price discrimination caused him to "force" business by over-allowing trade-ins. *Id.* at 563-64. The plaintiff also offered data that purportedly showed injury, but in fact revealed competitive success—such as a 1 percent gain in market share over the entire period. *Id.* at 564. Finally, the plaintiff offered no evidence as to the actual effect on retail prices and instead provided conflicting opinions from its owner, who asserted that his salesmen told him other dealers had lowered prices, and its expert, who opined that the others were likely to keep prices artificially high for lack of competition. *Id.* at 564.

Noting the "traditional rule excusing antitrust plaintiff from an unduly rigorous standard of proving antitrust injury," the Supreme Court nevertheless found the plaintiff's evidence "weak" but declined to answer the "close question" of whether the evidence sufficed to show antitrust injury because the lower court had failed to decide whether it even established a § 2(a) violation. *Id.* at 565, 567. The Supreme Court explained that, because the more relaxed rule for proof of antitrust injury depends "on the inequity of a *wrongdoer* defeating recovery of damages against him by insisting upon a rigorous standard of proof," a court must first find a § 2(a) violation before applying the relaxed rule. *Id.* at 568 (emphasis in original). The Supreme Court therefore remanded the case for the circuit court to determine whether the evidence established a § 2(a) violation. On remand, the Fifth Circuit held that the plaintiff had failed to establish a § 2(a) violation at trial[12] and therefore refused to exercise leniency regarding proof of damages. *Chrysler Credit Corp. v. J. Truett Payne Co.*, 670 F.2d 575, 581-82 (5th Cir. 1982). As a result, the sufficiency of the plaintiff's evidence under the relaxed standard for antitrust injury was never

---

[12] In its briefing, Chrysler incorrectly cites to the Fifth Circuit's previous holding, which was vacated by the Supreme Court. On remand, the Fifth Circuit determined that the plaintiff had failed to establish a § 2(a) violation at trial for reasons distinguishable from this case. The Fifth Circuit noted that the plaintiff had relied on inconsistent and conclusory evidence, such as its owner and expert witness coming to opposite conclusions about competitors' prices. *Chrysler Credit Corp. v. J. Truett Payne Co.*, 670 F.2d 575, 581 (5th Cir. 1982). In contrast, here, Stevens Creek's evidence consistently suggests that competitors lowered their prices. *See* Normandin Depo. at 20:8-21:6, 54:15-21; Coronel Depo. at 295:7-10, 301: 5-12; Zaheri Decl. ¶ 15; Stockton Report ¶¶ 42-51. The Fifth Circuit also noted that the plaintiff's owner admitted that the primary reasons for some of the alleged harm had nothing to do with price discrimination and highlighted the fact that "the average difference in bonus payments over the relevant period of competition amounted [at most] to only $11.00 per car." *J. Truett*, 670 F.2d at 581. Here, Stevens Creek does not admit to alternate causes and the parties do not dispute that the payments averaged more than $700 per car.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    determined.

2        Chrysler nevertheless relies on *J. Truett* to argue that Stevens Creek needs but does not

3    have direct proof to show antitrust injury. Chrysler contends that Stevens Creek can only establish

4    antitrust injury by showing that it lost sales to favored competitors—direct evidence that, as

5    discussed above, Stevens Creek does not have—or by showing that it lowered its car prices to win

6    sales, which Stevens Creek disavowed as a general practice in its interrogatory response. Mot. at

7    22-23 (citing Def.'s Exh. 3 (No. 13)).

8        Stevens Creek disagrees with this reading of the law, relying on *Alan's of Atlanta* to argue

9    that antitrust injury, like competitive injury, can be inferred through circumstantial evidence. In

10   *Alan's*, the plaintiff, a specialty camera retailer, showed that during an alleged price discrimination

11   period it received at most $60,458 in benefits, while a favored competitor received $372,034.

12   *Alan's of Atlanta, Inc. v. Minolta Corp.*, 903 F.2d 1414, 1416-17 (11th Cir. 1990). The plaintiff

13   showed that, over that time, its market share decreased significantly while the competitor's

14   increased and that sales in the industry are "heavily influenced by promotional expense." *Id.* at

15   1427-28. The Eleventh Circuit found this evidence sufficient to establish antitrust injury. The

16   plaintiff also provided an expert report concluding that the discrimination caused the plaintiff's

17   injury and showing that the competitor absorbed the plaintiff's lost market share. *Id.* at 1427-28.

18   The Eleventh Circuit found the evidence sufficient to "put the question [of causation] genuinely in

19   dispute, especially in light of the substantial evidence of [defendant's] wrongdoing," which

20   included intentionally giving unique benefits to one dealer. *Id.* at 1426-27. While recognizing that

21   "[t]here is enough for a jury to find otherwise, too" the court denied summary judgment because

22   "a reasonable inference [of causation] is raised by the evidence." *Id.* at 1428.

23       Chrysler responds that *Alan's* does nothing to change the requirement that a plaintiff needs

24   direct evidence to establish antitrust injury, relying on one footnote in *Alan's* to argue that the case

25   considered only injury to competitors, rather than consumers, contrary to *Volvo*'s holding. Reply

26   at 13-14. While Chrysler is correct that *Alan's* was decided prior to *Volvo*, which highlighted the

27   importance of injury to competition, Stevens Creek relies on *Alan*'s for its discussion of causation

28   rather than injury. The Court agrees with Stevens Creek that *Alan's* continues to stand for the

1 proposition that a plaintiff can establish causation through circumstantial evidence, just as *J.*

2 *Truett* stands for the proposition that a plaintiff can establish antitrust injury through

3 circumstantial evidence where a § 2(a) violation has been established.

4      The Court finds *Hasbrouck*, the sole Ninth Circuit case considering antitrust injury cited

5 by the parties, particularly instructive on this point. In *Hasbrouck*, a jury found that a 2.5 to 5.75

6 cent per gallon discount in gas violated the RPA. The plaintiffs offered testimony by several

7 witnesses stating that the gas market is strongly price sensitive, that the plaintiffs lost customers

8 and sales directly to the favored competitors because of price, and that the plaintiffs would have

9 recovered lost revenues had they received even a 2 or 3 cent discount. 842 F.2d at 1037, 1041. In

10 addition, the plaintiffs offered documentary evidence of increases in competitor's sales volume

11 over the same time that the plaintiffs' sales decreased. The Ninth Circuit found this evidence

12 sufficient to establish antitrust injury in part because "the injuries [plaintiffs] suffered were

13 precisely the type that would result from unlawful price discrimination." *Id.* at 1042.

14      The Ninth Circuit explained that, where the injury involved was "precisely the type of loss

15 that the claimed violations of the antitrust laws would be likely to cause," causality may "be

16 inferred from circumstantial evidence" and that a plaintiff need only establish that price

17 discrimination was a material, but not the sole cause, of the injury. *Id.* at 1042 (quoting *Zenith*

18 *Radio v. Hazeltine Research*, 395 U.S. 100, 125 (1969)). The Ninth Circuit noted that, "[w]hile a

19 defendant may introduce evidence of alternative causes of the injury, such evidence constitutes

20 only a part of the information the jury may consider in determining whether price discrimination

21 was or was not a material cause." *Id.* at 1042. "If there is sufficient evidence in the record to

22 support an inference of causation, the ultimate conclusion as to what the evidence proves is for the

23 jury." *Id.* at 1042 (quoting *Perkins v. Standard Oil*, 395 U.S. 642, 648 (1969)).

24      Because Chrysler incorrectly argues that Stevens Creek needs direct evidence to show

25 antitrust injury, Chrysler has failed to address the sufficiency of Stevens Creek's circumstantial

26 evidence. Therefore, Chrysler has not met its initial burden to prove the absence of a genuine issue

27 of material fact.

28      Even if Chrysler had succeeded to meet its burden, however, the Court finds that Stevens

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Creek has designated specific facts demonstrating the existence of genuine issues for trial, given

2    the relaxed standard for proof of antitrust injury that will apply if competitive injury is found in

3    this case. Specifically, Stevens Creek offers evidence to show that (1) the CJDR market is

4    competitive and price-sensitive; (2) the Surrounding Dealers were favored; (3) they used incentive

5    payments to lower their prices relative to Stevens Creek; and (4) Stevens Creek's sales fell during

6    the alleged price discrimination period while those of the Surrounding Dealers rose and the reverse

7    happened after the price discrimination period ended. This evidence, discussed in detail below,

8    could lead a reasonable trier of fact to infer both injury and causation.

9        **1.   Competitive, Price-Sensitive Market**

10           First, to show that the CJDR marketplace is competitive and price-sensitive, Stevens Creek

11   offers deposition testimony by numerous officials from Chrysler and Surrounding Dealers. Fred

12   Sherwood, Chrysler Dealer Placement Manager, testified that customers tend to seek prices from a

13   minimum of two dealers. Pl.'s Exh. 8 at 48:11-19, ECF 204-1. Christopher Chandler, Chrysler's

14   Director of U.S. Dealer Network; Ms. Castro, San Leandro's Controller; Mark Normandin,

15   Normandin's President; and Mr. Coronel, Fremont's General Manager, all agreed that a

16   customer's choice of dealer depends on price. *See* Pl.'s Exh. 3 (Chandler Depo.) at 50:20-25, ECF

17   202-6; Pl.'s Exh. 2 (Castro Depo.) at 53:9-19 (customer will go to a dealer for better price), ECF

18   202-5; Pl.'s Exh. 5 (Normandin Depo.) at 108:24-109:5 (price is "one of the more important

19   factors"), ECF 202-9; Pl.'s Exh. 4 (Coronel Depo.) at 227:3-5 (price is "most important" factor),

20   ECF 202-8. Mr. Normandin testified that "with every one of my sales . . . we need to reduce prices

21   to compete or . . . show more value of our dealership to the customer's business." Normandin

22   Depo. at 53:15-54:4. Meanwhile, Ken Putnam, Putnam's Dealer Principal, explained that Putnam

23   did not reach its objectives in certain months because it could not "chase [competitors] down the

24   rabbit hole" of lowering prices. Pl.'s Exh. 7 (Putnam Depo.) at 21:19-24, ECF 203-1. This

25   evidence suffices to suggest that the market is competitive and price-sensitive.

26       **2.   Price Discrimination**

27           As noted above, for the purposes of this motion, the parties do not dispute that the alleged

28   discrimination caused Stevens Creek to lose sales from August 2012 through June 2013, *see* Reply

Statement (Fact No. 47), or that the incentives averaged about 2.3 percent, or $700 per vehicle. Chrysler also does not dispute that, if a favored dealer is defined as one that received incentive payments, Fremont was a Favored Dealer or that Putnam, Normandin, and San Leandro were occasionally favored.

### 3. Lower Retail Prices

Stevens Creek offers evidence to show that the Surrounding Dealers used the payments from Chrysler to lower their retail prices relative to Stevens Creek's prices. Mr. Normandin testified that "yes, the incentives drive us to lower our prices to sell cars" and explained that a dealer expecting incentives can lower its retail prices because it knows it will have extra money to make its gross target. Normandin Depo. at 20:8-21:6, 54:15-21. Mr. Zaheri declared that Stevens Creek also cut prices at the beginning of each month, when it functioned as if it would receive incentives, but stopped cutting prices at the point in each month when it realized it could not meet its monthly objective and rely on the incentives. Zaheri Decl. ¶ 15. In addition, Mr. Stockton finds statistically significant evidence that Stevens Creek's prices relative to its competitors rose during the alleged price discrimination period and fell after it in a manner consistent with incentive discrimination. Stockton Report ¶¶ 48, 50, ECF 127-5.

### 4. Changes in Sales

Finally, Stevens Creek offers Mr. Stockton's "mass" calculations, described briefly above, to show that the price difference caused Stevens Creek's sales to drop. Mr. Stockton explained that these calculations, which control for the addition of Fremont, show that, during the price discrimination period, Stevens Creek "experience[d] a precipitous drop in its ability to draw customers given their distances." Stockton Report ¶ 52. Mr. Stockton also found that Stevens Creek's sales recovered after the discrimination period, but not to pre-discrimination levels. Mr. Stockton opined that this is consistent with the alleged price discrimination because the effects "are reasonably expected to have continued after the end of the price discrimination period" given a dealer's decreased "motivation to advertise, compensate employees, and invest in uncharged

United States District Court
Northern District of California

services" without incentive payments. *Id.* ¶¶ 52, 66.[13]

Stevens Creek also offers deposition testimony by Chrysler's expert witness, Glenn Woroch, stating that Stevens Creek's price increase relative to Normandin, San Leandro, and Putnam caused, at least in large part, Stevens Creeks' sales to fall during the alleged price discrimination period, *see* Pl.'s Exh. 11 (Woroch Depo.) at 98:17-22, ECF 205-2, and Mr. Coronel's testimony that he cannot think of any reason other than price advantage to explain why Fremont outsold Stevens Creek during Fremont's first year but no longer does. Coronel Depo. at 370:7-14.

Chrysler offers *Mays v. Massey-Ferguson, Inc.* to argue that this evidence cannot suffice to establish causation. *Id.* at 14. In *Mays*, the alleged price discrimination lasted only one day and concerned only 23 pieces of equipment. *Mays v. Massey-Ferguson, Inc.*, No. CIV. A. CV187-131, 1990 WL 80673, at *3 (S.D. Ga. Apr. 26, 1990). On that record, the court determined that the plaintiff had failed to establish competitive injury, much less antitrust injury. The court bolstered its antitrust injury ruling by noting that the plaintiff did not "know what price plaintiff quoted any of the [allegedly diverted] customers . . . . nor . . . what price these customers eventually paid . . . [nor] whether any of these customers shopped anywhere else" and by highlighting that the plaintiff had failed to offer evidence that its competitor lowered its prices or to provide any calculations of lost or altered market share. *Id.* at *4-*6.

---

[13] Stevens Creek also offers spreadsheets, calculated by a paralegal based on data compiled from other sources, showing that, in the 18 months before June 2012, the sales of San Leandro, Normandin, and Putnam were each a fraction of Stevens Creek's sales (55.1%, 62.1%, and 41.1% of Stevens Creek's sales, respectively). JR Decl. Exh. 1, ECF 198-1. In July 2012, those dealers continued to sell a fraction of what Stevens Creek sold (39.8%, 51.9%, and 26.3%, respectively) and Fremont, which entered that month, sold only 45.1% of Stevens Creek's sales. The same calculations show that, from August 2012 through June 2013, however, San Leandro, Normandin, and Fremont all flipped to outselling Stevens Creek, and Putnam grew to equal a larger percentage of Stevens Creek's sales. *Id.* Then, after the alleged price discrimination ended, Stevens Creek returned to outselling all but Normandin from July 2013 to August 2015, with the sales of Fremont, San Leandro, and Putnam again a fraction of Stevens Creek's sales (89.1%, 72.9%, and 38.5%, respectively). *Id.* Over the same period, the margin between Normandin's and Stevens Creek's sales also shrank. *Id.* In other words, the calculations show that every surrounding competitor's sales relative to Stevens Creek's sales were higher between August 2012 and July 2013 than they were before or have been since. The Court has some concerns about the admissibility of this evidence at trial. While these calculations could form the basis of an expert opinion, it is not clear at this stage who can testify as to the meaning of these numbers.

The sole similarity between *Mays* and this case is Stevens Creek's failure to offer direct evidence of any diverted customer. However, as discussed at length above, because Stevens Creek has succeeded in showing that competitive injury is a disputed issue for trial—alleging that the discrimination spanned at least 11 months and asserting that it affected 503 vehicles, in contrast to the *Mays* plaintiff's one day and 23 pieces of equipment. As a result, Stevens Creek may rely on circumstantial evidence, which the *Mays* plaintiff also lacked. Unlike the *Mays* plaintiff, Stevens Creek has offered evidence to show that favored competitors lowered their prices and has provided calculations regarding lost or altered market share. In addition, Stevens Creek has offered evidence to show that the market is price-sensitive and competitive.

Thus, viewing the evidence in combination and in the light most favorable to Stevens Creek, the Court finds that a jury could reasonably infer injury and causation from the record and Stevens Creek has therefore demonstrated that antitrust injury remains a genuine issue for trial. In reaching this conclusion, the Court is bound by *Hasbrouck*'s guidance that where, as here, the injury is "precisely the type of loss that the claimed violations of the antitrust laws would be likely to cause," causality may "be inferred from circumstantial evidence" and that a plaintiff need only establish that price discrimination was a material, but not the sole cause, of the injury. 842 F.2d at 1042. Accordingly, the Court DENIES Chrysler's Motion for Summary Judgment with regard to antitrust injury.

### C.  Functional Availability

While the bulk of the parties' briefing focuses on competitive and antitrust injury, Chrysler offers one final argument in support of its motion: that Stevens Creek cannot show that Chrysler's incentive payments were functionally unavailable to Stevens Creek. Functional availability is a judicially-created doctrine under which "a uniform pricing formula applicable to all customers is not a price discrimination under the act[ ] if the favorable price was available, not only in theory but in fact, to all purchasers." *Smith Wholesale Co. v. R.J. Reynolds Tobacco Co.*, 477 F.3d 854, 867 (6th Cir. 2007) (internal citation omitted).

Though the Court was unpersuaded by this argument at the pleading stage, Chrysler asks the Court to return to it on a more developed record. Chrysler contends that the evidence shows

United States District Court
Northern District of California

1    that Chrysler simply applied standard practices and policies during the allegedly discriminatory

2    period and Stevens Creek chose not to meet the objectives. Mot. at 23-25. Chrysler points to Mr.

3    Woroch's description of the formula used for sales objectives during alleged discrimination

4    period, which was the same for all existing dealers, Woroch Report ¶ 13, and Mr. Thompson's

5    testimony that for "[e]very dealer" Chrysler looked at the same things. Thompson Depo. at 108:3-

6    15. In addition, Chrysler notes that Mr. Stockton offered no opinion as to whether Stevens Creek

7    could have achieved its objectives using commercially reasonable efforts. *See* Stockton Depo. 3 at

8    716:9-13. This suffices to meet Chrysler's burden to prove the absence of a genuine issue of this

9    material fact, shifting the burden to Stevens Creek.[14]

10        In response, Stevens Creek offers evidence showing that Stevens Creek's objectives were

11   121% of Stevens Creek's expected sales during the alleged discrimination, while Fremont's

12   objectives were 87% of its expected sales. *See* Pl.'s Exh. 42, ECF 214-5. Furthermore, it is not

13   disputed that Chrysler calculated Fremont's sales objectives using a different formula than it used

14   for Stevens Creek in the first year following Fremont's entry. *See* Ans. ¶ 41; *see also* Def.'s Exh. 5

15   (No. 7). In other words, Chrysler did not use a "uniform pricing policy" and the discounts were

16   therefore not "functionally available on an equal basis."[15] Even if they had been, the parties do not

17   dispute that Stevens Creek tried but failed to meet its objectives in July. This suffices to meet

18   Stevens Creek's burden to show that functional availability remains a disputed issue for trial.

19        Accordingly, Stevens Creek has met its burden to come forth with evidence from which a

20   jury could reasonably render a verdict in its favor and Chrysler's motion is DENIED as to

21

22   [14] As the Court explained in its First Dismissal Order, the Ninth Circuit has not yet decided
     whether functional unavailability is an element of Stevens Creek's *prima facie* case or an
23   affirmative defense to § 2(a). Because Stevens Creek argues that it has offered sufficient evidence
     to meet its burden, the Court assumes without deciding that functionality is an element of Stevens
24   Creek's case.

25   [15] Chrysler contends that the Court need only consider the commercial reasonableness of Stevens
     Creek's efforts to achieve its incentives, not the uniformity with which Chrysler set the objectives.
26   However, Chrysler offers no case law to support this position and the Court finds it unpersuasive.
     *See, e.g., Smith*, 477 F.3d at 867 ("Where a purchaser does not take advantage of a lower price or
27   discount which is *functionally available on an equal basis*, it has been held that either no price
     discrimination has occurred, or that the discrimination is not the proximate cause of the injury.")
28   (emphasis added).

1   functional availability.[16]

2       **IT IS SO ORDERED.**

3   Dated:  August 2, 2016

4   _____

5   BETH LABSON FREEMAN
    United States District Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27   [16] The Court DENIES Chrysler's request to brief additional grounds for summary judgment, *see*
Mot. at 23, as the Civil Local Rules require Chrysler to make any objections to evidence in its

28   summary judgment papers and sets page limits that Chrysler has already filled, if not exceeded,
with its existing arguments.

United States District Court
Northern District of California